[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-11050

_____

Agency No. 005600-17


TOT PROPERTY HOLDINGS, LLC,
TOT LAND MANAGER, LLC,
TAX MATTERS PARTNER,

                                                            Petitioners-Appellants,

versus

COMMISSIONER OF INTERNAL REVENUE,

                                                            Respondent-Appellee.


_____

Petition for Review of a Decision of the
United States Tax Court

_____

(June 23, 2021)

Before LAGOA, ANDERSON, and MARCUS Circuit Judges.

ANDERSON, Circuit Judge:

Whether the taxpayer in this case could properly claim a deduction turns on

whether language in a deed was an unenforceable savings clause, dependent on a

condition subsequent, or a valid interpretive clause.  The deed at issue donated for conservation purposes an easement encumbering the taxpayer's property.  The Internal Revenue Code and related regulations permit deductions for the donation of such easements, but only if certain conditions are met to further the conservancy goal, including that the donee be granted a right to a specific proportion of the proceeds in the event the easement is judicially extinguished.  The Internal Revenue Service disallowed the deduction claimed by the taxpayer in this case, and the Tax Court upheld that decision because the deed conveying the easement contained a formula for the distribution of proceeds that did not comply with the extinguishment proceeds requirement and the deed was not saved by purported interpretive provisions.  On appeal, the taxpayer challenges this holding and also argues that the Tax Court's approval of accuracy-related penalties (assessed in light of the disallowance of the deduction) was based on erroneous findings of fact regarding the property's "highest and best use" before the easement began encumbering the property and was based on an erroneous view of the law with respect to whether the penalties were approved by a supervisor "in writing."

    We conclude that the Tax Court correctly determined that the taxpayer did not comply with the extinguishment proceeds requirement and that the deed was not saved by the disputed provisions because they constitute an unenforceable condition-subsequent savings clause.  We also hold that the Tax Court did not

2

commit reversible error in approving the penalties assessed.  As explained below, we affirm.

## I.  FACTS AND PROCEDURAL HISTORY

Rural property in between Nashville, Knoxville, and Chattanooga and the transactions related to its ownership sit at the center of this case.  We explain those transactions, the reasons for tax liability, and the underlying tax proceedings.

A. Property Transactions

In 2005, George R. Dixson purchased 2,602 acres of rural, undeveloped real estate in Van Buren County, Tennessee, for about $1.9 million.  In 2008, Dixon transferred 652 acres, which accounted for about $486,000 of the original purchase price, to two limited liability companies that he wholly owned.[1]  These 652 acres comprise the property at issue in this case.  In November 2013, that 652 acres was transferred to TOT Property Holdings, LLC ("TOT Holdings")—the taxpayer in this case—which, after the transfer, owned only the property and $100 cash.[2]  In this opinion, we will interchangeably use the terms "TOT" and Appellants to refer

---

[1]    The LLCs were Evergreen Pines Plantation, LLC ("Evergreen") and Harper Branch Forest, LLC ("Harper").

[2]    Evergreen, Harper, and TOT Property Manager LLC ("Property Manager"), which was another entity wholly owned by Dixson, together owned 99.99% of TOT Holdings.

jointly to TOT Holdings and TOT Land Manager, LLC (or simply "Land Manager"). Land Manager is TOT Holdings's tax matters partner.[3]

A taxable year for TOT Holdings came to an end on December 10, 2013, and a new one started the next day. On December 10, 2013, PES Fund VI, LLC ("PES Fund")[4] purchased almost the entirety of the ownership interest in TOT Holdings. For the TOT Holdings interest—which amounted to 98.99% of the company—PES Fund paid $717,200 in cash and assumed the sellers' obligations to make $322,000 in capital contributions, a total consideration of $1,039,200.[5] The record does not indicate that PES Fund's purchase was anything but an arm's-length transaction. When the dust settled, PES Fund owned nearly all of TOT Holdings, an entity that owned only the 652 acres of property and $100.[6]

---

[3]     The remaining 0.01% of TOT Holdings was owned by Land Manager.

[4]     The record indicates that PES Fund was an investment vehicle created to benefit from the indirect ownership of the property (through TOT Holdings) and the possible tax deduction that prompted these proceedings. A 0.01% interest in PES Fund was owned by Land Manager, and the other 99.99% of PES Fund and all of Land Manager itself were owned directly and indirectly by investor entities and individuals (that were not Dixson).

[5]     While the purchase agreement had included $507,800 worth of capital contributions, capital contributions were limited by TOT Holdings's operating agreement.

[6]     Property Manager retained an interest in TOT Holdings (1.0%), as did Land Manager (0.01%).

B.  Conveyance of the Easement and the Deed

On December 27, 2013, a few weeks after the PES Fund transaction, TOT Holdings executed a deed that donated to Foothills Land Conservancy ("Foothills") a conservation easement encumbering nearly all its property.

Section 9 of the deed governs extinguishment and condemnation of the easement.  Section 9.1, the extinguishment section, states:

> If circumstances arise in the future that render the purpose of this Easement impossible to accomplish, the Easement can only be terminated or extinguished, whether in whole or in part, by judicial proceedings in a court of competent jurisdiction.  The amount of the proceeds to which Grantee shall be entitled from any sale, exchange, or involuntary conversion of all or any portion of the Property subsequent to such termination or extinguishment, shall be the stipulated fair market value of this Easement, or proportionate part thereof, as determined in accordance with Section 9.2 or 26 C.F.R. Section 1.170A-14, if different.

Section 9.2 of the deed is entitled "Valuation."  The easement is a real property interest immediately vested in Foothills.  According to Sections 9.1 and 9.2, the stipulated fair market value of the easement at the time of such future extinguishment (which will determine the "amount of the proceeds to which Grantee shall be entitled") shall be determined by (as stated in Section 9.2):

> multiplying (a) the fair market value of the Property unencumbered by this Easement (minus any increase in value after the date of this grant attributable to improvements) by (b) a fraction, the numerator of which is the value of this Easement at the time of the grant and the denominator of which is the value of the Property without deduction of the value of this Easement at the time of this grant.

In other words, this Section 9.2 formula provides that, upon any such future extinguishment (e.g. condemnation), the proceeds (e.g. proceeds of the condemnation) shall be reduced by "any increase in value after the date of this grant attributable to improvements," and then the charitable donee's share would be determined by multiplying that reduced amount times the defined fraction. And the numerator and denominator of the fraction are the value, respectively, of the easement and unencumbered property at the time of the grant. Section 9.2 then concludes as follows: "It is intended that this Section 9.2 be interpreted to adhere to and be consistent with 26 C.F.R. Section 1.170A-14(g)(6)(ii)."[7]

This language at the end of Section 9.2 regarding intent to adhere to 26 C.F.R. § 1.170A-14(g)(6)(ii) and the language at the end of Section 9.1—requiring proceeds be "determined in accordance with Section 9.2 or 26 C.F.R Section 1.170A-14, if different"—were together called the "Treasury Regulation Override" by the parties and the Tax Court. We adopt this nomenclature for the purposes of this opinion.[8]

_____

[7]     Section 9.3 states that the ratio set forth in Section 9.2 also governs Foothills's share of a recovery from condemnation of all or any part of the property. Section 9.4 requires Foothills to use the proceeds from extinguishment or condemnation consistent with the conservation purposes.

[8]     TOT abandons use of the "Override" term and makes arguments regarding only the effect of Section 9.1's "if different" language in its reply brief. In this opinion, we will use the term as the parties did in the Tax Court. We will use the term "Treasury Regulation Override" or just "Override" to refer to both provisions jointly (both the phrase in Section 9.1 and the last sentence

C. Tax Filings and IRS Decisions

TOT Holdings timely filed a Form 1065 partnership tax return for the period beginning December 11, 2013, and ending December 31, 2013, on which it reported a charitable contribution of a qualified conservation easement of $6.9 million.[9]  An IRS revenue agent examined the tax return and determined that the easement did not qualify for the claimed deduction and that accuracy-related penalties were applicable.

On May 10, 2016, the IRS sent Land Manager, as Tax Matters Partner for TOT Holdings, a copy of the revenue agent's report related to TOT Holdings's tax return for the period ending December 31, 2013.  The report was transmitted with a Letter 1807 signed by the revenue agent's immediate supervisor, an IRS group manager.  The transmittal letter stated, in part,

> We enclosed a copy of our summary report on the examination of the partnership listed above for you as Tax Matters Partner (TMP). The report explains all proposed adjustments including facts, law, and conclusion. . . .  We will discuss all proposed adjustments in the summary report at the closing conference.

About two months later, on July 8, 2016, the IRS group manager signed a civil penalty approval form for the penalties in the revenue agent's report.

---

of Section 9.2), although we acknowledge that the "if different" phrase in Section 9.1 is the crucial provision because only it could accomplish the override that Appellants seek.

[9]     TOT Property Holdings attached to its return a qualified appraisal by David R. Roberts as required by I.R.C. § 170(f)(11) that valued the easement at $6.9 million.

On January 3, 2017, the IRS issued a notice of final partnership administrative adjustment ("FPAA") to TOT Holdings disallowing the conservation easement deduction because TOT had not established that the deduction met the requirements of I.R.C. § 170 or that the value of the easement was $6.9 million as claimed. The IRS asserted a 40% penalty for a gross valuation misstatement or, in the alternative, a 20% penalty for negligence pursuant to § 6662.

D. Tax Court Proceedings

TOT filed a Tax Court petition against the Commissioner of the IRS (the "Commissioner") to challenge the FPAA. After a bench trial, the Tax Court decided three main issues—all also at issue in this appeal—and held for the Commissioner.

First, the Tax Court held that the deed failed to protect the conservation purpose of the easement in perpetuity, a requirement for a deduction in I.R.C. § 170(h)(5)(A). This was because the formula for the distribution of extinguishment proceeds in Section 9.2 of the deed was inconsistent with the regulation that defined this protected-in-perpetuity requirement in 26 C.F.R. § 1.170A-14(g)(6)(ii). The deed impermissibly provided that the donee's proportion of the proceeds would subtract out, and thus not include, any increase in value (after the date of the charitable gift) attributable to improvements. While

8

TOT argued that the deed included the Treasury Regulation Override as an interpretive tool that required compliance with the regulation, the Tax Court concluded that the Override provisions were unenforceable as "condition subsequent savings clauses." Without the Override, the non-compliant Section 9.2 formula would impermissibly apply in extinguishment proceedings, and the IRS properly denied TOT's deduction.

Second, accuracy-related penalties pursuant to I.R.C. § 6662 were applicable. A valuation of the easement was necessary to determine the extent of the penalties. Both parties submitted expert evidence using a "before and after" method for valuation. TOT's expert, Mr. Wingard, opined that the easement had a fair market value of $2,732,000[10] based on his opinion that (i) before donation, the property was worth $3,913,000 with a highest and best use as low density, destination mountain resort residential development; and (ii) after donation, the property was worth $1,181,000 with a highest and best use for recreation and timber revenue. On the other hand, the Commissioner's expert, Mr. Barber, opined that the easement had a value of $496,000 based on his opinion that (i) before donation, it was worth $1,128,000 with a highest and best use as an investment property held for recreation and timber revenue, and (ii) after donation, it was

---

[10] We note that TOT does not attempt to defend the $6.9 million valuation that it claimed on its return.

9

worth $632,000, concluding the highest and best use was recreation and timber (as had Mr. Wingard). The Tax Court adopted Mr. Barber's valuation because of his credibility, the "improbability" of Mr. Wingard's conclusion regarding the highest and best before use of the property, and the other evidence in the record, including the arm's-length PES Fund transaction from just a few weeks before the donation of the easement—of which Mr. Barber had been unaware—that corroborated Mr. Barber's before valuation.

Third, and finally, the Tax Court determined that the IRS had complied with I.R.C. § 6751(b)(1)'s requirement that the initial determination of a penalty be approved in writing by an immediate supervisor because the Letter 1807 dated May 10, 2016, enclosing the revenue agent's report, was signed by a supervisor.

Having resolved these three issues,[11] the Tax Court concluded that the penalties applied to TOT were appropriate. TOT otherwise could not avoid the penalties because it failed to establish a defense of reasonable cause and good faith as to any portion of its underpayment.

TOT timely appealed the Tax Court's decision.

---

[11] The parties also disputed whether the conservation easement failed to meet the requirements for a deduction because state law on extinguishment allowed for the property to be returned to the fee holder and whether the conservation purposes could be defeated by inconsistent uses allowed in the deed. The Tax Court did not reach these issues because it held in favor of the Commissioner on the first of the three main issues. We do not reach them for the same reason.

## II. DISCUSSION

TOT appeals the Tax Court's decision upholding the IRS's disallowance of the deduction and the imposition of penalties. Appellants' arguments on appeal track those presented to and decided by the Tax Court. They argue: (A) that the easement deed complies with the regulatory formula requirement because the Treasury Regulation Override is an interpretive guide that requires compliance with the regulation; (B) that the value of the easement should have been based on the property's highest and best before use as a residential development; and (C) that an IRS supervisor did not approve the penalties in writing until after the initial determination. We address each in turn and conclude the Tax Court did not err.

A. <u>Whether The Treasury Regulation Override Establishes the Deed's Compliance with the Regulations for a Deduction for a Qualified Conservation Contribution</u>

The dispositive question for whether the taxpayer may claim a deduction in this case is whether the Treasury Regulation Override provisions in Section 9 of the easement deed are impermissible savings clauses that are triggered by a condition subsequent, on the one hand, or valid interpretive provisions, on the other. If the former, the deed is not in compliance with 26 C.F.R. § 1.170A-14, no deduction can be claimed, and we must affirm the Tax Court on this issue. If the latter, it is at least arguable that the deed complies. As a legal question, we review it de novo. <u>Clay v. Comm'r</u>, 990 F.3d 1296, 1300 (11th Cir. 2021). And we keep

11

in mind that "deductions are a matter of legislative grace, and the taxpayer has the burden of proving his entitlement to any claimed deduction." Tucker v. Comm'r, 841 F.3d 1241, 1249 (11th Cir. 2016).  The importance of this narrow question is best understood within the statutory and regulatory framework governing the deed and claimed deduction.  We review that framework before addressing the narrow question.

  1. The statutes and regulations for conservation easements require a specific formula for the distribution of extinguishment proceeds, and the formula in the deed is different than the specific regulatory formula.

Federal tax deductions are generally not allowed for anything less than a full donation of real property, but an exception is made for a "qualified conservation contribution."  I.R.C. § 170(f)(3)(B)(iii); see 26 C.F.R. § 1.170A-14(a).  A "qualified conservation contribution" is "a contribution . . . (A) of a qualified real property interest, (B) to a qualified organization, (C) exclusively for conservation purposes."  I.R.C. § 170(h)(1).[12]  This appeal involves the last of these three requirements, to which § 170(h)(5)(A) adds some color, stating that "[a] contribution shall not be treated as exclusively for conservation purposes" pursuant to § 170(h)(1)(C) "unless the conservation purpose is protected in perpetuity."  The

---

[12]    The parties stipulated that Foothills as donee of the easement in this case is a qualified organization pursuant to I.R.C. § 170(h)(1)(B).

statute does not define this "protected-in-perpetuity" requirement.  Thus, we turn to the applicable regulations, which Appellants concede are valid.[13]

The regulations require, in relevant part, that to meet the protected-in-perpetuity requirement, the deed donating the property restriction, e.g. an easement, must account for the possibility of unexpected changes to the property that would undermine the continued use of the property for conservation purposes. 26 C.F.R. § 1.170A-14(g)(6)(i).  In the event of such changes, judicial extinguishment is required, and the donee of the restriction must receive a share of the proceeds determined by the following regulatory formula:

> [F]or a deduction to be allowed . . . , at the time of the gift the donor must agree that the donation of the perpetual conservation restriction gives rise to a property right, immediately vested in the donee organization, with a fair market value that is <u>at least equal to the proportionate value that the perpetual conservation restriction at the time of the gift, bears to the value of the property as a whole at that time</u>. See § 1.170A–14(h)(3)(iii) relating to the allocation of basis. For purposes of this paragraph (g)(6)(ii), that proportionate value of the donee's property rights shall remain constant.  Accordingly, when a change in conditions give rise to the extinguishment of a perpetual conservation restriction under paragraph (g)(6)(i) of this section, <u>the donee organization</u>, on a subsequent sale, exchange, or involuntary conversion of the subject property, <u>must be entitled to a portion of the proceeds at least equal to that proportionate value of the perpetual conservation restriction</u> . . . .

---

[13]    Because of this concession—i.e. because Appellants do not challenge the validity of the regulation—we do not address that issue.

Id. § 1.170A-14(g)(6)(ii) (emphasis added).[14]  Thus, the regulations require that the donee of an easement be granted a vested right to the value of judicial sale proceeds (e.g. in condemnation) multiplied by "a fraction equal to the value of the conservation easement at the time of the gift, divided by the value of the property as a whole at that time."  PBBM-Rose Hill, Ltd. v. Comm'r, 900 F.3d 193, 207 (5th Cir. 2018).[15]

Appellants do not seriously dispute that the formula in Section 9.2 of the deed is different from this regulatory formula.  Nor could they plausibly do so. Section 9.2 states that Foothills, as donee, is entitled to proceeds that are "determined by multiplying (a) the fair market value of the Property unencumbered by this Easement (minus any increase in value after the date of this grant attributable to improvements) by (b) a [defined] fraction."  Unlike the formula in

---

[14]    Section 1.170A-14(g)(6)(ii) also states that it applies to donations made after February 13, 1986, like the donation in this case, and provides for an exception related to the state law issue left unaddressed by the Tax Court, see supra note 11.

[15]    While the parties occasionally refer to the "perpetuity requirements" (plural) of I.R.C. § 170(h), to be clear, only one such perpetuity requirement—i.e. I.R.C. § 170(h)(5)(A)'s requirement that the conservation purpose be protected in perpetuity—is at issue in this case. Section 170(h)(5)(A) imposes a separate requirement from § 170(h)(2)(C), which asks only whether some restriction on the land has been granted in perpetuity.  Pine Mountain Pres., LLLP v. Comm'r, 978 F.3d 1200, 1207 (11th Cir. 2020).  "Though both requirements speak in terms of 'perpetuity,' they are not one and the same."  Belk v. Comm'r, 774 F.3d 221, 228 (4th Cir. 2014).  The parties make no arguments particular to § 170(h)(2)(C)'s granted-in-perpetuity requirement.  Indeed, the Treasury Regulation Override, on which the briefing focuses, refers to 26 C.F.R. § 1.170A-14(g)(6), and that regulation determines whether "the conservation purpose can nonetheless be treated as protected in perpetuity" in the event of judicial extinguishment, not treated as granted in perpetuity.  Therefore, there is no issue in this case as to whether the claimed tax deduction, and the easement deed, comply with § 170(h)(2)(C).

Section 9.2, the regulation does not allow for "any increase in value after the date of th[e] grant attributable to improvements" to be subtracted from the extinguishment (e.g. condemnation) proceeds before the fraction is applied to the proceeds. No such "minus" language is included in the formula set out in § 1.170A-14(g)(6)(ii). Thus, the deed is different from and out of compliance with the formula set out in the regulation.

Our holding thus far is supported by the same holding of the Fifth Circuit in PBBM-Rose Hill, Ltd. v. Commissioner. That case also involved a taxpayer's challenge to the Tax Court's disallowance of a deduction for a similar conservation easement because the easement deed did not satisfy the "protected in perpetuity" requirement in § 170(h)(5)(A). 900 F.3d at 205–09. The easement deed in that case contained an extinguishment provision—the same in material respects as Section 9.2 in the instant case—that "permit[ed] the value of improvements to be subtracted out of the proceeds [e.g. extinguishment proceeds], prior to the donee taking its share." Id. at 207. Construing the same regulation applicable here—26 C.F.R. § 1.170A-14(g)(6)(ii)—the Fifth Circuit held that for a deduction to be allowed, the charitable donee must receive from the proceeds of an extinguishment of the easement (e.g. in a condemnation) the proportionate share required by the regulation, without any subtraction of the value of improvements. Id. at 208. As the Fifth Circuit held: "The regulation does not indicate that any amount,

15

including that attributable to improvements, may be subtracted out." Id.  Because

the taxpayer's extinguishment provision did not meet the requirements of

regulation § 1.170A-14(g)(6)(ii), the "protected in perpetuity" requirement of the

statute and regulations was not met and the taxpayer was not entitled to a

deduction for its conservation easement contribution. Id. at 205–09.[16]

The Tax Court in Coal Property Holdings, LLC v. Commissioner also held

that subtracting the value of improvements from the donee's share of

condemnation proceeds is inconsistent with the regulation and similarly leads to a

disallowance of the charitable deduction.  153 T.C. 126, 144 (2019).  The Tax

Court held:  "Section 1.170A-14(g)(6)(ii) . . . plainly requires that the charitable

grantee be guaranteed to receive, upon a sale following judicial extinguishment of

the easement, its full proportionate share of the sale proceeds." Id.  The deed in

Coal Property violated this requirement because the formula required by section

9.2 in that deed—which used the exact same language as the deed formula in

---

[16]     Although Appellants acknowledge the above holdings of the Fifth Circuit, Opening Br. at 23, 25–27, they argue that their Override provision is an enforceable interpretive provision which overrides the formula set out in Section 9.2 because it is inconsistent with the regulation so that, they argue, "the donee will always receive at least the full amount it is entitled to under 26 C.F.R. § 1.170A-14(g)(6)," id. at 27.  In support of their argument that their Override provision is merely interpretive, Appellants also rely on PBBM-Rose Hill.  However, Appellants' reliance on the Fifth Circuit case focuses on a provision in the deed in that case which is very different from the "if different" provision of Section 9.1, which is crucial in this case.  See infra Section II.A.3.  Although the Fifth Circuit did hold that the provision to which Appellants refer was an interpretive provision, it was not only very different but also was employed there as a guide to interpret conflicting provisions in the easement deed there.  By contrast here, Section 9.2 is unambiguous and cannot be interpreted to mean what the regulation requires.  Thus, contrary to Appellants' argument, they can find no support from PBBM-Rose Hill.

Section 9.2 in this case—provided that the taxpayer "will receive all of the sale proceeds to the extent those proceeds are attributable to appreciation in the value of improvements." Id.

Appellants attempt to circumvent the problem of inconsistency of Section 9.2 with the requirements of the regulation, and the resulting disallowance of their deduction, by relying on the Treasury Regulation Override provisions of Sections 9.1 and 9.2. They argue that, pursuant to those provisions, the amount of the proceeds to which Foothills is entitled shall be "determined in accordance with Section 9.2 or 26 C.F.R Section 1.170A-14, if different," and "[i]t is intended that this Section 9.2 be interpreted to adhere to and be consistent with 26 C.F.R. Section 1.170A-14(g)(6)(ii)." Appellants' argument is that these provisions are interpretive tools that operate to require proceeds to be distributed in compliance with 26 C.F.R § 1.170A-14. Because the formula in Section 9.2—the preferred alternative to applying § 1.170A-14, according to the deed—is, in fact, "different" from the regulatory formula and the deed requires the regulations to always control, TOT argues that we must interpret the deed to comply with the regulation.

TOT argues that the Tax Court erred in holding that the Treasury Regulation Override provisions were not interpretive and contained a "condition subsequent savings clause." Whether the donation of the conservation easement is deductible, thus, turns on whether the Override provisions in the easement deed are

unenforceable savings clauses, rather than valid interpretive provisions. We turn next to discuss the distinction between a condition subsequent savings clause, on the one hand, and a merely interpretive clause on the other hand.

> 2. The Treasury Regulation Override provisions are either valid interpretive provisions or invalid savings clauses.

For federal tax purposes, courts and the IRS have refused to enforce a clause that purports to save an instrument from being out of compliance with the tax laws if the clause is operative by way of a condition subsequent. "A condition subsequent rests on a future event, 'the occurrence of which terminates or discharges an otherwise absolute contractual duty.'" Belk v. Commissioner, 774 F.3d 221, 229 (4th Cir. 2014) (quoting 30 Richard A. Lord, Williston on Contracts § 77:5 (4th ed.)). Such "clauses that seek to 'recharacterize the nature of the transaction in the event of a future' occurrence 'will be disregarded for federal tax purposes.'" Id. (quoting I.R.S. Tech. Adv. Mem. 2002-45-053 (Nov. 8, 2002)). On the other hand, "[w]hen a clause has been recognized as an 'interpretive' tool"—and thus valid— "it is because it simply 'help[s] illustrate . . . intent' and [i]s not 'dependent for [its] operation upon some subsequent adverse action by the Internal Revenue Service,'" or a tribunal. Id. at 230 (quoting I.R.S. Tech. Adv. Mem. 79-16-006 (1979)) (citations omitted); e.g., PBBM-Rose Hill, 900 F.3d at 204 ("Unlike the savings clause in *Belk*, paragraph 6.2 imposes no condition

18

subsequent, but is merely a clause concerning the interpretation of the deed.").[17]

Interpretive provisions are valid; conditions subsequent savings clauses "will not

be enforced." Belk, 774 F.3d at 229; e.g., Coal Prop., 153 T.C. at 141 ("[The

provision] thus constitutes a 'condition subsequent' saving clause. The courts have

consistently declined to enforce such provisions.").

To determine whether the Treasury Regulation Override provisions in the

deed here are interpretive provisions or condition-subsequent savings clauses, we

are guided by two cases from the Fourth Circuit, both of which held that clauses

that purported to save a claimed tax deduction were unenforceable savings clauses.

First, in Belk v. Commissioner—a case affirming the disallowance of a

deduction for the donation of a conservation easement—the clause at issue stated

the donee "shall have no right or power to agree to any amendments . . . that would

result in this Conservation Easement failing to qualify . . . as a qualified

conservation contribution under Section 170(h) of the Internal Revenue Code and

applicable regulations." 774 F.3d at 228. The taxpayers, the Belks, argued that

this clause was an interpretive clause that ensured regulatory compliance for

deduction purposes, despite any facial non-compliance with I.R.C. § 170(h)(2)(C).

Id. at 229. The Fourth Circuit held that the clause was unenforceable because it

---

[17]     Paragraph 6.2 is the provision mentioned above, supra note 16, in the PBBM-Rose Hill case on which Appellants seek to rely.

rested on a future occurrence to save the deed and deduction and amounted to an "ask . . . to 'void' the offending . . . provision to rescue the[] tax benefit." Id. There was also "no open interpretive question for the savings clause to 'help' clarify." Id. at 230. Instead, the Belks hoped for the court to rewrite their easement deed where—if their intent had truly been as they said—they would have written the deed to be compliant with the applicable regulations in the first place. Id. "[T]o apply the savings clause as the Belks suggest[ed]" would be "sanctioning the very same 'trifling with the judicial process' [the court] condemned in" the second of our guiding Fourth Circuit cases (discussed next), and would lead to the "dramatic[] hamper[ing] [of] the Commissioner's enforcement power" and tax collection "grind[ing] to a halt." Id. (citation omitted).

Our second guiding case is Commissioner v. Procter, 142 F.2d 824 (4th Cir. 1944). In Procter, the taxpayer sought to avoid a gift tax by arguing that the following clause (in a trust indenture assigning to trustees interests in other trusts) avoided the possibility of a gift tax:

> [I]n the event it should be determined by final judgment or order of a competent federal court of last resort that any part of the transfer in trust hereunder is subject to gift tax, it is agreed by all the parties hereto that in that event the excess property hereby transferred which is decreed by such court to be subject to gift tax, shall automatically be deemed not to be included in the conveyance in trust hereunder and shall remain the sole property of Frederic W. Procter free from the trust hereby created.

142 F.2d at 827.  The Tax Court had held in favor of the taxpayer, but the Fourth

Circuit reversed because the only way a gift tax could be assessed was by way of

collection and court proceedings, and the above-quoted clause, if valid, would

operate to nullify any such proceedings.  Id.  Such a condition subsequent was void

as "contrary to public policy."  Id.  "It is manifest," explained the court, "that a

condition which involves this sort of trifling with the judicial process cannot be

sustained."  Id.  Thus, the clause impermissibly contained a condition subsequent

that attempted to save the assignment from taxation and was unenforceable.

Procter reasoned that the clause "ha[d] a tendency to discourage the collection of

the tax by the public officials charged with its collection, since the only effect of an

attempt to enforce the tax would be to defeat" the attempt.  Id.  The Fourth Circuit

also held that "the effect of the condition would be to obstruct the administration of

justice by requiring the courts to pass upon a moot case" since "the only possible

controversy" would be "the validity of the" clause's operation "between the donor

and persons not before the court."  Id.

The Tax Court has similarly refused to enforce such condition subsequent

savings clauses.  Indeed, it did so in a case construing language almost identical to

the Treasury Regulation Override language in this case.  Coal Prop., 153 T.C. at

140–44; see also Palmolive Bldg. Invs., LLC v. Comm'r, 149 T.C. 380, 405 (2017)

(holding a "saving clause [could not] retroactively modify the [conservation

21

easement] [d]eed to comply with [I.R.C.] section 170 and its regulations," in particular the protected-in-perpetuity requirement of § 170(h)(5)(A), because the Tax "Court and others have held that '[w]hen a savings clause provides that a future event alters the tax consequences of a conveyance, the savings clause imposes a condition subsequent and will not be enforced'" (quoting Belk, 774 F.3d at 229)).

With these cases in mind, we analyze the Treasury Regulation Override in this case and find it similarly unenforceable.[18]

3. The Treasury Regulation Override provisions of the easement deed contain a condition subsequent that is unenforceable and cannot override the inconsistent formula in Section 9.2 and cannot save TOT's tax deduction.

Three primary features of the Treasury Regulation Override provisions convince us that, like the clauses in Belk and Procter, they are unenforceable savings clauses, not merely interpretive provisions. That is, TOT cannot use the

---

[18]      Appellants do not argue in this case that Belk and Procter were wrongly decided. Rather, as indicated in the text, they argue only that they are distinguishable because the Override provisions in this case constitute interpretive language, not a condition subsequent savings clause. Opening Br. at 19–22; Reply Br. at 11–15. Although Appellants do argue that Coal Property was decided wrongly, they give no reason other than that the language should not have been construed to constitute a condition subsequent savings clause. Opening Br. at 9, 16–18; Reply Br. at 15–17. Similarly, Appellants only argue that the Tax Court wrongly relied on Palmolive because that case involved a regulation regarding the subordination of mortgage interests in 26 C.F.R. § 1.170A-14(g)(2) and this case involves no such issue, Opening Br. at 22–23, but Appellants do not contest the Palmolive court's holding regarding the unenforceable savings clause.

22

Override to avoid taxation because the formula in Section 9.2 is unambiguous, the

Override nullifies it, and it does so only in the event of some future occurrence.[19]

First, the formula in Section 9.2 of the easement deed is unambiguous.  It

plainly and unambiguously provides that the required fraction, or proportionate

share, shall be applied to the sales proceeds "minus any increase in value after the

date of th[e] grant attributable to improvements."  Juxtaposed against the deed's

alternative formula—that in 26 C.F.R. § 1.170A-14(g)(6)(ii)—Section 9.2's

subtraction of the value of property improvements is stark.  As in Belk, therefore,

"[t]here is no open interpretive question for the savings clause to 'help' clarify."

774 F.3d at 230.  Rather, Section 9.2 unambiguously provides that the value

attributable to improvements will be subtracted from condemnation proceeds

before the required fraction is applied.

Second, the operation of the Treasury Regulation Override provisions in this

case means that the preferred formula—expressly described in the easement deed

---

[19]     The two separate provisions that comprise the Treasury Regulation Override are different despite Appellants' grouping them together in their opening brief.  Section 9.1 includes language that, if enforceable, would literally apply the regulation over the formula in Section 9.2; that is, it says that Section 9.2's formula applies in the first instance, but that the regulation applies "if different."  The other part of the Override is the last sentence of Section 9.2, which states that "[i]t is intended that this Section 9.2 be interpreted to adhere to and be consistent with 26 C.F.R. § 1.170A-14(g)(6)(ii)."  Unlike Section 9.1, this part of 9.2 does not contain the express condition subsequent.  We need not decide whether the last sentence of Section 9.2, by itself, could possibly be construed to be merely interpretive or, even if interpretive, whether it could, by itself, override the clear intent of Section 9.2 that the charitable donee not share in any increase in value attributable to improvements.  However, as we explain, the joint interpretation of the two provisions of the Override means that this case involves an unenforceable, condition subsequent savings clause.

in Section 9.2—is simply nullified.  Again, Section 9.1 defines the fair market value of Foothills's proceeds "as determined in accordance with Section 9.2 or 26 C.F.R Section 1.170A-14, if different."  Thus, Section 9.1 clearly states that Section 9.2's formula applies; it is first in the provision and has no condition attached to it.  Then, the provision continues to contemplate the regulation's application, but its application is conditional.  That is, the application of the regulation is conditioned on whether it is "different" from the plain text of the express formula in the easement deed in Section 9.2.  If it is "different," the Override operates to simply rewrite the easement deed to eliminate the Section 9.2 formula, leaving operative only the regulatory formula.  If enforced, then, the Override would then impermissibly "countermand the plain text of the [e]asement [d]eed."  Coal Prop., 153 T.C. at 141; e.g., Belk, 774 F.3d at 230 ("Thus, the Belks ask us to employ their savings clause not to aid in determining [their] intent, but to rewrite their Easement in response to our holding.  This we will not do." (internal quotation marks omitted) (citation omitted)).

Third, for the Override to be triggered and for the regulation to apply as the proper formula over Section 9.2's formula, a future event must occur, i.e. a determination that the proper interpretation of the regulation is "different" from the formula set forth in Section 9.2.  And, in this sense, Foothills's property right to proceeds "equal to the [regulatory] proportionate value" is not "immediately

vested," 26 C.F.R. § 1.170A-14(g)(6)(ii), as the regulation requires, since the defined right to proceeds—without improvements subtracted out—is conditioned on a subsequent IRS or court determination.

Appellants make a few other arguments that we reject as without merit. They argue that the Treasury Regulation Override provisions are not conditioned on any adverse action by the IRS or a court; they argue that this means the Override is an interpretive provision, and not a condition subsequent savings clause. But whether Section 9.2 is "different" from § 1.170A-14(g) or whether Section 9.2's formula can be interpreted as consistent with the regulation are questions that only the IRS or a court can determine. The clear necessity of an IRS or court determination makes the Appellants' attempt to hide this necessity (while hidden by slightly more shrouded language than in Belk) unavailing. That is, while the Procter court examined language that expressly tied the savings clause's effect to "an adverse IRS determination or court judgment," and that is not present in this case, we can think of no likely instance in which there might be an interpretation by anyone other than a court or the IRS that could lead to an operative interpretation of the Override that we can credit now for tax deduction purposes. TOT attempted to hedge its bets on both sides of the issue, hoping it could win no matter what. But as in Belk, the Treasury Regulation Override "operates in precisely the same manner as that in Procter." 774 F.3d at 239.

25

Indeed, the "if different" Override language is the same sort of catch-22 situation that leads to the "trifling with the judicial process," Procter, 142 F.3d at 827, that case law has held to be unenforceable.

For the foregoing reasons,[20] the Treasury Regulation Override provisions in this easement deed cannot operate to have the regulatory formula apply instead of Section 9.2's formula. We summarize as follows. First, the unambiguous language of the formula set out in Section 9.2 is inconsistent with the formula required by 26 C.F.R. § 1.170A-14. Second, case law that Appellants do not challenge (e.g., the Fourth Circuit Belk and Procter cases) holds that a condition subsequent savings clause is unenforceable for federal tax purposes. Third, the language of Sections 9.1 and 9.2 of the easement deed—especially the "if different" language—constituted an unenforceable condition subsequent savings clause, and not merely interpretive guidance as the taxpayer urges. Accordingly, the formula set out in Section 9.2 controls over the "if different" savings clause in Section 9.1 such that the "protected-in-perpetuity" requirement of the statute and regulation is not satisfied and the charitable gift of the easement deed does not qualify as an allowable deduction for federal tax purposes. Thus, the Tax Court correctly upheld the IRS's disallowance of TOT's claimed deduction.

---

[20]    Appellants' other arguments are rejected without need for further discussion.

B. The Tax Court's Valuation of the Easement Was Not Clearly Erroneous

At trial before the Tax Court, TOT relied on the expert opinion of Mr. Wingard—that the easement was worth $2,732,000 based on a valuation of the property before donation of the easement at $3,913,000 and $1,181,000 after. The easement was donated on December 27, 2013, just about two weeks after 98.99% of TOT Holdings itself—which owned only the property and $100 cash—was purchased by PES Fund for $1,039,200. This sale price indicated that the property was worth about $1,049,703[21] as of December 10, 2013, just a short time before the easement's donation. This market transaction indicates that Appellants' assertions regarding the property and easement's values are dubious. What are clearly more accurate are the figures offered by the Commissioner's expert witness, Mr. Barber, who—without knowledge of the PES Fund transaction—calculated the property's before value to be $1,128,000. For this reason, and those explained below, we hold that the Tax Court did not clearly err in valuing the easement for purposes of assessing accuracy-related penalties.

---

[21] This $1,049,703 figure is the sale price adjusted for the fact that PES Fund bought slightly less than all of TOT Holdings (98.99%) and that TOT Holdings owned, in addition to the property, $100. That is, $1,039,200 divided by 98.99%, minus $100, equals $1,049,703.

1. In assessing accuracy-related penalties, the tax laws required consideration of the easement's fair market value, partially based on the entire property's best and highest use before the easement's donation.

"Taxpayers who underpay their taxes due to a 'valuation misstatement' may incur an accuracy-related penalty." United States v. Woods, 571 U.S. 31, 43, 134 S. Ct. 557, 565, 187 L. Ed. 2d 472 (2013). The degree of a misstatement determines the severity of the penalty. The IRS will assess a 20% penalty for a "substantial valuation misstatement," which is a misstatement of 150% or more of the correct value, and a 40% penalty for a "gross valuation misstatement," which is a misstatement of 200% or more of the correct value. I.R.C. § 6662(a), (b)(3), (e)(1)(A), (h)(1), (h)(2). The 40% penalty will apply to the portion of the underpayment attributable to the gross valuation misstatement. Id. § 6662(h)(1).

The correct value of a conservation easement is "the fair market value of [it] at the time of the contribution." 26 C.F.R. § 1.170A-14(h)(3)(i). "A determination of fair market value is a mixed question of fact and law: the factual premises are subject to a clearly erroneous standard while the legal conclusions are subject to *de novo* review." Palmer Ranch Holdings Ltd v. Comm'r, 812 F.3d 982, 994 (11th Cir. 2016) (quoting Est. of Jelke v. Comm'r, 507 F.3d 1317, 1321 (11th Cir. 2007)). The fair market value of the easement is generally calculated based on sales prices of comparable easements, but "[i]f no substantial record of market-place sales is available to use as a meaningful or valid comparison," the "before-

28

and-after" valuation method is used. § 1.170A-14(h)(3)(i). The before-and-after method calculates the fair market value as "the difference between the fair market value of the property pre- and post-encumbrance." Pine Mountain, 978 F.3d at 1211; § 1.170A-14(h)(3)(i).

The before-and-after method was used by the parties, their experts, and the Tax Court in this case. Appellants do not challenge the Tax Court's use of the method, the way any dollar figures were attached to the before and after uses, nor the "after" valuation in any way. Instead, Appellants challenge only the court's factual determinations related to the conclusion regarding the highest and best use of the property before the donation of the easement.

To determine the before value—that is, "the fair market value of the property before contribution of the conservation restriction"—the regulations require a determination of the property's highest and best use before donation. The before valuation

> must take into account not only the current use of the property but also an objective assessment of how immediate or remote the likelihood is that the property, absent the restriction, would in fact be developed, as well as any effect from zoning, conservation, or historic preservation laws that already restrict the property's potential highest and best use.

26 C.F.R. § 1.170A-14(h)(3)(ii).[22]  The highest and best use is one that is a "reasonable and probable use that supports the highest present value," with a "focus . . . on 'the highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future.'" Palmer Ranch, 812 F.3d at 987 (quoting Symington v. Comm'r, 87 T.C. 892, 897 (1986)).  Where, as here, the parties proposed different uses, we consider "[i]f there is too high a chance that the property will not achieve the proposed use in the near future," in which case "the use is too risky to qualify." Id. at 1000 (citing Symington, 87 T.C. at 897).  "The principle can also be articulated in terms of willingness to pay.  If a proposed use is too risky for 'a hypothetical willing buyer [to] consider [the use] in deciding how much to pay for the property,' then the use should not be deemed the highest and best available." Id. at 1000 n.14 (quoting Whitehouse Hotel Ltd. P'ship v. Comm'r, 615 F.3d 321, 335 (5th Cir. 2010)).

The step after determining the highest-and-best use is to calculate a dollar value based on that use. PBBM-Rose Hill, 900 F.3d at 209.  Appellants' arguments, however, are limited to challenging the before value found by the Tax Court.  And Appellants' only challenge with respect to that relates to the factual

---

[22]    Similarly, "if before and after valuation is used, an appraisal of the property after contribution of the restriction must take into account the effect of restrictions that will result in a reduction of the potential fair market value represented by highest and best use." 26 C.F.R. § 1.170A-14(h)(3)(ii).  But, again, the after-donation valuation is not at issue in this case.

basis for the Tax Court's conclusion regarding the highest and best before use. Therefore, we review—for clear error only because no legal arguments are made—the Tax Court's conclusion regarding the property's highest and best before use and TOT's arguments. We find no clear error.

   2. The Tax Court did not clearly err in its conclusion regarding the highest and best before use and in rejecting the proposed residential development use.

The Tax Court in this case determined that, before the easement's donation, the property's highest and best use was as an investment property held for recreation and timber revenue and had a fair market value of $1,128,000, adopting the conclusions of the Commissioner's expert, Mr. Barber. The Tax Court found Mr. Barber and his conclusions to be credible in light of other evidence regarding the characteristics of the property and its surrounding area and that the PES Fund sale corroborated Mr. Barber's before number without Mr. Barber having been aware of the sale. Mr. Barber's unbiased valuation of the property was thus just $78,297 off from the actual market sale–based value, as opposed to $2,863,297 off, as Mr. Wingard was.

The Tax Court rejected Mr. Wingard's conclusion that the highest and best use before the donation was for residential development and, specifically, low density, destination mountain resort residential development. The Tax Court

31

determined this was "highly unlikely" given the property's characteristics and the failures of other developments near the property.

The evidence presented regarding these characteristics and nearby developments supported the Tax Court's rejection of Mr. Wingard's proposed highest and best before use. The court explained that the evidence revealed the 652 acres of property in Van Buren County, Tennessee and the surrounding area were, and continued to be through 2013, generally rural and undeveloped. The property contained no mountains or large bodies of water. It had two small streams that were frequently dry. The nearest highway was about 32 miles away, and there was no hospital in the county. As of 2013, the property had telephone and electricity access but not public water. Hardwood trees like oaks and hickory had occupied the surrounding area but were clear cut and replaced with softwoods.

The evidence also showed that elsewhere in Van Buren County, there was some development but there was no indication that this development supported TOT's proposed highest and best use before the easement was donated in 2013. In particular, about five miles northwest of the property was a development called Overton Retreat, which was more or less a failure, in the Tax Court's words, because 62 lots had been sold from July 2002 through January 2013, yet sales slowed between 2009 and 2013 (as evidenced by only three of those sixty-two lots being sold during that time). As of 2013, only 11 of the Overton lots sold had been

32

improved, and an expected additional phase of development was never undertaken. Similarly, Isha Village, a retreat destination in the county, was platted around 2006 or 2007 but only had its first sales a decade later in 2017, well after the donation of the easement. Indian Trails was another failed development and purported Ponzi scheme without any infrastructure built; it failed to support TOT's position. And while Long Branch Lakes was a gated community that had success prior to 2013, there was no evidence presented regarding sales of lots in 2013 and the parties did not treat it as comparable in any event.

In light of this evidence, Appellants' arguments largely emphasize that they perceive a different view of the characteristics of the property and different conclusions to be gleaned from the various nearby properties. Of course, Appellants' different inferences from the underlying facts implicate matters of pure fact and, as we explain below, we conclude that the inferences drawn by the Tax Court were eminently reasonable and far from clearly erroneous. We conclude that ample evidence supports the Tax Court's valuation findings, and that TOT fails woefully to demonstrate clear error.

As an initial matter, Appellants' arguments ignore the overwhelmingly significant fact that a mere seventeen days before the conservation easement deed, an arm's-length sale of the property at issue occurred at a price that was slightly less than the valuation independently arrived at by Mr. Barber and adopted by the

33

Tax Court. Appellants do not challenge the arm's-length nature of the sale. This sale provides overwhelming support for the Tax Court's finding of the before use value of the property—which, as noted above, is the only error with respect to valuation which Appellants challenge on appeal. The arm's-length sale supports not only the dollar valuation found by the Tax Court, but also its finding that the highest and best before use was as investment property held for recreation and timber revenue, as opined by Mr. Barber—not a low density, destination mountain resort residential development, as opined by Mr. Wingard.[23]

Ample additional evidence also supports the Tax Court's finding with respect to the highest and best use. The Tax Court found Mr. Barber's report and testimony credible and rejected the report and testimony of Mr. Wingard. As the Tax Court found, the surrounding area was generally rural and undeveloped. There also were no population centers within a distance that might suggest residential development. With respect to the kind of mountain residential development relied upon by Mr. Wingard, the only relevantly close examples— e.g. Overton Retreat—were reasonably found by the Tax Court to be "failed

---

[23] Unlike Mr. Barber, Mr. Wingard had been aware of this arm's-length transaction when he valued the property but did not take it into account for his valuation. He reasoned that he did not consider owning a partial interest in an entity that owns property the same as owning the property itself. We reject Mr. Wingard's reason; it makes no common sense. When the partial interest is a 99% ownership interest and complete control, as here, and when the property is the only asset of the entity (besides $100 cash), it is clear that the parties considered the price paid to be the fair market value of the property.

developments." And the Tax Court found that those existing developments were in mountainous areas with scenic views or views of large bodies of water such as lakes. The Tax Court found that the property at issue lacked such physical features. The Tax Court could reasonably find that, even if such developments had been more successful, any foreseeable demand for the kind of mountain residential property relied upon by TOT and Mr. Wingard would be absorbed by the superior attributes and availability of those existing developments, leaving no foreseeable demand for the instant property which lacked such attractive features.

We readily conclude that the Tax Court was not clearly erroneous in its findings with respect to the before value of the property at issue, or with respect to its finding that the highest and best use of the property was as investment property held for recreation and timber revenue. Indeed, we conclude that overwhelming evidence supports the Tax Court's findings in this regard. Because Appellants' challenge to the penalties based on valuation errors focused solely on the Tax Court's before value and its reliance on the highest and best use indicated by Mr. Barber, we conclude that the Tax Court was not clearly erroneous in rejecting Appellants' valuation-based challenge to the accuracy-related penalties.[24]

---

[24]    TOT does not contest the Tax Court's adoption of Mr. Barber's after-donation use and value because it had adopted his before use and value. Having done so, the Tax Court concluded the best and highest after use was as an investment property with the potential for limited timber harvesting and private recreation, and the value was $632,000. The difference between the values—i.e. the value of the easement—was $496,000.

35

C. The Commissioner Established Compliance with the "In Writing" Supervisory-Approval Requirement for Penalty Assessment

Finally, Appellants argue that the penalties should not be assessed, regardless of the valuation contentions, because the IRS failed to comply with the supervisory-approval requirement for penalties in I.R.C. § 6751(b)(1). We review the Tax Court's legal conclusion on this issue de novo. Clay, 990 F.3d at 1300.

Section 6751(b)(1) states that "[n]o penalty . . . shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate." I.R.C. § 6751(b)(1). "The plain language of § 6751(b) mandates only that the approval of the penalty assessment be 'in writing' and by a manager (either the immediate supervisor or a higher level official)." PBBM-Rose Hill, 900 F.3d at 213.

The Tax Court concluded that the transmittal letter signed by the revenue agent's immediate supervisor, an IRS group manager, satisfied § 6751(b)(1).[25] That letter stated the IRS "enclosed a copy of [its] summary report on the

[25] The Commissioner maintains that the mailing of the revenue agent's report was not the "initial determination" of penalties but argues that we need not reach the issue if we affirm on the Tax Court's holding that the penalties were approved in writing anyway. Because we do affirm on the "in writing" issue, we do not reach the initial determination issue and assume arguendo that the mailing of the revenue agent's report constituted the initial determination as urged by TOT. Furthermore, we need not reach the issue of timing implied in the parties' assertions; that is, while the supervisor also signed a civil penalty approval form months after the presumed initial determination, we need not decide whether this could constitute valid and timely approval in writing of penalties.

36

examination of" TOT and stated "[t]he report explains all proposed adjustments including facts, law, and conclusion."  "[A]ll proposed adjustments in the summary report" would be discussed "at the closing conference."  Those "proposed adjustments including facts, law, and conclusions" that accompanied the letter were therefore actually provided to the taxpayer in the report, including the penalties to be assessed.  We conclude that the Tax Court was correct on this point.  The reasonable inference to be drawn from the transmittal letter and its language is that the supervisor that signed the letter approved the proposed penalties, as well as the other adjustments in the revenue agent's report.

TOT argues that this is not sufficient because the letter was nothing more than a transmittal letter given that there was no indication in the letter or the report that a supervisor approved the penalties.  TOT highlights, instead, the civil penalty approval form signed by the group manager on July 8, 2016, well after the letter was sent.  We reject TOT's argument.

TOT fails to explain why "proposed adjustments including facts, law, and conclusion" would not include penalties or why we would conclude that the group manager signed the letter without having approved part of those proposed adjustments, i.e. the penalties, or the report it accompanied.  Furthermore, the statute does not indicate that the supervisor's approval in writing must be on a particular document.  There is no regulation on point.

In addition, at the time of the mailing of the transmittal letter and report, the version of the Internal Revenue Manual—which in any event does not have the force of law, United States v. Rum, 995 F.3d 882, 893 (11th Cir. 2021)—did not require that a specific document embody the approval to satisfy § 6751(b).  See I.R.M. § 20.1.1.2.3(6) (2016) ("The managerial review and approval must be documented in writing and retained in the case file.  The manager must indicate the decision reached, sign, and date the case history document.").  Similarly, the current version of the manual does not require written approval in any particular document but merely permits approval by way of a penalty approval form.  See I.R.M. § 20.1.1.2.3(6) (2021) ("The initial determination of the penalty must be personally approved in writing by the immediate supervisor, dated, and retained in the case file.  Supervisory approval may be documented on a penalty approval form, in the form of an email, memo to file or electronically.  The approval must cover all tax years and penalties, including alternative penalties." (emphasis added)).  Thus, the IRS guidance does not support Appellants' view of the statutory requirement.

Appellants cite no case that supports their position, and our research has uncovered none.  To the contrary, in a case appealed to the Fifth Circuit, the Tax Court had rejected the precise argument presented by Appellants in this case.  The Fifth Circuit stated:

38

> The tax court concluded that the managerial-approval requirement was fulfilled by a managerial signature on the cover letter of a summary report on the examination of PBBM that included the "Gross Valuation Overstatement Penalty Issue Lead Sheet." The Lead Sheet showed that an IRS examiner had determined that the penalty was applicable to underpayments attributable to the claimed deduction for the conservation easement. The IRS sent the cover letter and summary report to PBBM in November 2011, prior to the issuance of the FPAA in August 2014. We agree with the tax court's conclusion.

PBBM-Rose Hill, 900 F.3d at 213 (footnote omitted). Thus, the Fifth Circuit decision supports the Commissioner's position in this case that the supervisor's cover letter transmitting the revenue agent's report of proposed adjustments satisfies the requirement of § 6751(b)(1) that the supervisor approve the penalty in writing.

We hold that the Tax Court was correct that the Commissioner established that a supervisor approved the penalties in writing by way of the transmittal letter sent with the revenue agent's report and that this satisfies § 6751(b)(1). We conclude that this is a common sense interpretation of the supervisor's transmittal letter, enclosing the revenue agent's report which proposed and explained all of the proposed adjustments, including in particular the proposed penalties.

39

CONCLUSION

For the foregoing reasons, we affirm the Tax Court's upholding of the IRS's disallowance of TOT's tax deduction and the assessment of accuracy-related penalties.

AFFIRMED.