# United States Tax Court

T.C. Memo. 2026-23

HARMAN ROAD PROPERTY, LLC, CAPITAL CONSERVATION
PARTNERS II, LLC, TAX MATTERS PARTNER, ET AL.,[1]
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 12304-20, 12517-20,                    Filed March 2, 2026.
13271-20, 13663-20.

————

*Anson H. Asbury*, *Robert B. Gardner III*, *Ethan J. Vernon*, and *Maggie-Machre K. Garrett*, for petitioners in Docket Nos. 12304-20, 12517-20, and 13271-20.

*Anson H. Asbury*, *Robert B. Gardner III*, *Ethan J. Vernon*, *Lauren H. White*, and *Maggie-Machre K. Garrett*, for petitioner in Docket No. 13663-20.

*Jacklyn G. Martin*, *Rishi K. Jain*, *Casey N. Epstein*, and *Sarah M. Raben*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

WEILER, *Judge*: These consolidated cases involve noncash charitable contribution deductions claimed for tax year 2016. By separate Notices of Final Partnership Administrative Adjustment

---

[1] The following cases are consolidated herewith: Green Rock Properties, LLC, Paul Seefried, Tax Matters Partner, Docket No. 12517-20; Tigner Property, LLC, Tigner Investors, LLC, Tax Matters Partner, Docket No. 13271-20; and 970 Turner Property, LLC, Capital Conservation Partners, LLC, Tax Matters Partner, Docket No. 13663-20.

[*2] (FPAAs) respondent disallowed charitable contribution deductions claimed by Green Rock Properties, LLC (Green Rock), and Harman Road Property, LLC (Harman Road) (collectively, Partnerships), for their grants of conservation easements to the Oconee River Land Trust.[2] The conservation easements include Green Rock's 140.15 acres (Green Rock Property) and Harman Road's 191.61 acres (Harman Road Property) (collectively, Properties) in Meriwether County, Georgia.[3]

After concessions,[4] the issues remaining for decision are (1) the fair market values (FMVs) of the two conservation easements and (2) whether any number of penalties under sections 6662(b), (c), (d), (e), and (h) and/or 6662A are applicable.

We hold that Green Rock is entitled to a charitable contribution deduction of $81,000 for tax year 2016, and Harman Road is entitled to a charitable contribution deduction of $145,000 for tax year 2016. With respect to penalties, we conclude the 40% gross valuation misstatement penalty applies since the FMVs claimed exceed the FMVs determined herein by more than 200%. *See* I.R.C. § 6662(a), (h).

---

[2] Tigner Property, LLC, and 970 Turner Property, LLC, agreed to be bound by the test case—Harman Road. Green Rock is consolidated with the cases for trial, briefing, and opinion, but it is tried concurrently with Harman Road.

[3] Green Rock and Harman Road donated approximately 125.15 and 181.61 acres to Oconee River Land Trust, but petitioners take the contiguous parcels of land into consideration in their total valuations.

[4] The parties agree that respondent complied with the procedural requirements set forth in section 6751(b) for all penalties asserted under sections 6662 and 6662A. Respondent conceded that the penalties asserted under section 6662A resulting from the identification of syndicated conservation easement transactions pursuant to I.R.S. Notice 2017-10, 2017-4 I.R.B. 544, are inapplicable. In addition, petitioners did not object to our precluding their introducing evidence to establish a reasonable cause, good faith, or reliance defense for penalties under section 6664(c). Respondent did not raise the section 170 requirements for deductions on brief, and we accordingly deem these issues abandoned or conceded. *See, e.g.*, *Mendes v. Commissioner*, 121 T.C. 308, 312–13 (2003) ("If an argument is not pursued on brief, we may conclude that it has been abandoned."). Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[*3]                    FINDINGS OF FACT

Some of the facts are stipulated and are so found. The Stipulations of Facts and the attached Exhibits are incorporated herein by this reference.

Green Rock and Harman Road are both treated as partnerships subject to the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71. For federal income tax purposes, Paul Seefried is the tax matters partner for Green Rock, and Christopher C. Welton is the tax matters partner with respect to Harman Road (collectively, petitioners). The Partnerships are Georgia limited liability companies (LLCs) with principal places of business in the State of Georgia.

I.    *Relevant History of the Seefried Family, Christopher Welton, and Pierre Howard*

     A.    *The Seefried Family (Ferdinand and Paul Seefried)*

Ferdinand Seefried (Mr. Seefried) moved to Atlanta, Georgia, in the 1970s from Austria. Mr. Seefried began his career in investment banking and later transitioned to working for an Austrian-German owned real estate company. In 1984 Mr. Seefried founded Seefried Industrial Properties, which focuses on building warehouses for American and European Union companies. Seefried Industrial Properties is headquartered in Atlanta with offices in Chicago, Illinois; Dallas, Texas; Phoenix, Arizona; and Los Angeles, California.

In 2024 Mr. Seefried retired from the daily operations of Seefried Industrial Properties and his son, Paul Seefried (Paul), took over managing the company. Paul has worked for Seefried Industrial Properties since 2011.

In 1998 Mr. Seefried purchased his first property in Meriwether County, Georgia, on the Flint River. Since 1998 Mr. Seefried purchased 12 different properties which, other than approximately 150 acres, are contiguous along Highway 18, south of Greenville, Georgia, between the cities of Woodbury and Greenville.

     B.    *Christopher Welton and Pierre Howard*

Christopher Welton has an undergraduate degree, a master of business administration degree, and a law degree from the University

[*4] of Georgia. After law school, Mr. Welton worked in commercial real estate for six and a half years until he joined the Atlanta Committee for the 1996 Atlanta Olympic Games. After the Atlanta Olympic Games, Mr. Welton owned various marketing companies and worked in consulting before starting Capital Conservation Partners, LLC (CCP), in 2016. Since 1998 Mr. Welton has owned property in Meriwether County. Currently, he owns approximately 700 acres and controls 900 acres in Meriwether County.

Pierre Howard graduated from the University of Georgia School of Law in 1968. Mr. Howard served in the Georgia Senate for 18 years and was elected and served as lieutenant governor of Georgia for two consecutive four-year terms. In addition Mr. Howard served as president of the Georgia Conservancy. While at the Georgia Conservancy, Mr. Howard started a program that assisted Georgia farmers by granting conservation easements on farmland. Mr. Howard was also a partner in CCP when it structured the conservation easement for the Harman Road Property.

II.    *Subject Properties and Ownership History*

A.    *Green Rock Property*

On August 21, 2012, the Seefrieds, through an LLC,[5] purchased 335.28 acres of land in Meriwether County for $779,526, which was transferred via limited warranty deed on September 24, 2012. The acquired acreage was divided into two tracts of land: Green Rock South and Green Rock North.[6] Green Rock North included the Green Rock Property, the property in issue. On September 8, 2016, 140.15 acres, the Green Rock Property, was distributed to the Seefrieds as tenants in common.

On June 22, 2016, Green Rock's articles of organization were filed with the State of Georgia with a 95% ownership interest allocated to Mr. Seefried and a 5% ownership interest allocated to Paul. On September 8, 2016, the Seefrieds conveyed the Green Rock Property to Green Rock.

On June 22, 2016, Green Rock Investors, LLC (GR Investors), was formed and its organizing documents were filed with the Georgia secretary of state. GR Investors' operating agreement designated Paul

---

[5] The Seefrieds established an initial LLC—Green Rock, LLC—which purchased the land in issue.

[6] Green Rock South was subject to a conservation easement in 2015.

[*5] as its managing member. On December 16, 2016, a membership interest purchase agreement (MIPA) was executed between GR Investors and Mr. Seefried. In the transfer Mr. Seefried sold approximately 89% of his interest in Green Rock to GR Investors for $2,004,639. The ownership of Green Rock as of December 16, 2016, included GR Investors, with 89%, Paul, with 5%, and Mr. Seefried, with 6%.

Green Rock Property is surrounded by the Seefrieds' land in Meriwether County. The Green Rock Property is along the east side of Overby Road, south of State Highway 109, north of Cedar Rock Road, and east of U.S. Highway 27. It is accessible on Highway 18 by accessing the Seefried's private road—Overby Road.[7] There are no streams or wetlands on the Green Rock Property. In 2016 it was zoned for A–1, Agricultural District.



B.    *Harman Road Property*

In 2016 Mr. Welton organized CCP in Georgia. In August 2016 CCP and Claude P. Harman, Jr., and Mary Anne Harman (collectively, Harmans) entered into a MIPA for the sale of a portion of the Harmans' 229.43 acres of land in Meriwether County. The MIPA specified that

---

[7] Overby Road was a country road until the Seefrieds petitioned the county commission to have the road abandoned as a public country road.

[*6] CCP would form a new LLC—Harman Road—which was organized under the laws of the State of Georgia on September 6, 2016. On October 26, 2016, the Harmans contributed 191.61 acres in Meriwether County by limited warranty deed to Harman Road in exchange for a 99% membership interest, and Capital Conservation Partners II, LLC (CCP II),[8] acquired a 1% membership interest in Harman Road for approximately $15,464.

On September 6, 2016, Harman Road Investors, LLC (HR Investors), was organized under the laws of the State of Georgia.[9] The purpose of the company was to acquire, hold, manage, finance, sell or dispose of up to 97% of the membership interest in Harman Road.

After this step, on November 28, 2016, the Harmans sold to CCP Acquisitions II, LLC (CCP Acquisitions II),[10] a 97% membership interest in Harman Road for $1.5 million.

On that same day, November 28, 2016, HR Investors and CCP Acquisitions II entered into a MIPA whereby CCP Acquisitions II sold its 97% membership interest in Harman Road to HR Investors for $3,406,044.26. An amended and restated operating agreement for Harman Road was executed on November 28, 2016, to reflect the new membership interests: HR Investors a 97% interest, the Harmans a 2% interest, and CCP II a 1% interest.

The Harman Road Property is a rectangular tract of land surrounded by properties owned by the Harmans. The Harman Road Property is along the south side of Harman Road, the west side of Tigner Road, the north side of Stovall Road, and the south of State Highway 109. Flat Shoals Creek runs across the Harman Road Property. In 2016 it was zoned for A–1, Agricultural District, and RR, Rural Reserve District.

---

[8] CCP II was organized in Georgia on October 20, 2016, and allocated ownership interests between Mr. Welton, Mr. Howard, and YFT Partners, LLC, each with a 33.333% interest.

[9] The HR Investors' Operating Agreement dated October 27, 2016, designated CCP II as the managing member.

[10] CCP Acquisitions II also was organized in Georgia on October 20, 2016, and allocated ownership interests among Mr. Welton, Mr. Howard, and YFT Partners, LLC, each with a 33.333% interest.

[*7]

### C.     *The Piedmont Fall Line*

The Properties are both within the Piedmont physiographic province of Georgia. Piedmont province contains weathering resistant granitic bedrock. East of the Piedmont province is the Atlantic Coastal Plain province. The "Piedmont Fall Line" is where the Piedmont province meets with the Atlantic Coastal Plain. Easily and economically mineable granite mines are positioned on or to the north of the "Piedmont Fall Line." The Properties are both within the Piedmont province and north of the "Piedmont Fall Line."

### III.     *The Conservation Easement Transaction*

### A.     *Green Rock Property*

Green Rock hired Terracon Consultants, Inc. (Terracon), to drill on the Green Rock Property beginning on July 6 and ending on July 19, 2016. Terracon used diamond bit rock coring techniques to drill four borings of approximately 20 to 150 feet below existing site grades. Terracon also conducted laboratory tests on three composites of rock core samples taken from borings to confirm the granite stone is construction grade aggregate.[11]

Green Rock also engaged Paul A. Schroeder, a registered professional geologist, to review and evaluate the Terracon report. Dr.

---

[11] "Construction aggregate" is a broad term and includes crushed granite rock that is of a certain quality and size and is a component used to create asphalt, concrete, and construction materials.

[*8] Schroeder estimated that 15.1 million tons of granite reserves were on the Green Rock Property; he further estimated 500,000 tons of salable construction aggregate per year; and he determined an overburden depth ranging between 0 and 20 feet. Dr. Schroeder prefaced his report by stating "that major aggregate producers drill on a much higher density (closer spacing) than what was done for our study [Green Rock Property] before they commit any economic resources to opening or expanding a quarry operation."

Green Rock retained a second registered professional geologist, Richard C. Capps, Ph.D., Qualified Person,[12] with Capps Geoscience, LLC, to review the Terracon report. On September 16, 2016, Mr. Capps concluded that the value of the Green Rock Property's aggregate reserve is $13 million rounded. Mr. Capps estimated a total production of 7.2 million tons of crushed stone aggregate projected over a 25-year mine life.

Green Rock engaged two different appraisers to value the Green Rock Property but ultimately relied upon Dale Hayter's appraisal. Mr. Hayter graduated with a bachelor of architecture degree from the University of Texas and has a master's degree in landscape architecture from the University of Georgia. He is a member of the Appraisal Institute, holds its MAI designation, and is licensed in Georgia, North Carolina, Tennessee, Alabama, and West Virginia.

Mr. Hayter first performed a preliminary appraisal of the Green Rock Property for a valuation date of December 15, 2016. Mr. Hayter's final appraisal dated April 3, 2017, for a valuation date of December 21, 2016, was for the Green Rock Property's entire 140.15 acres[13] and was attached to Green Rock's 2016 Form 1065, U.S. Return of Partnership Income. Mr. Hayter's final report determined the property's highest and

---

[12] A Qualified Person is an individual who is (1) "a mineral industry professional with at least five years of relevant experience in the type of mineralization and type of deposit under consideration and in the specific type of activity that person is undertaking on behalf of the registrant" and (2) "an eligible member or licensee in good standing of a recognized professional organization at the time the technical report is prepared." U.S. Sec. & Exch. Comm'n, *Modernization of Property Disclosures for Mining Registrants: A Small Entity Compliance Guide*, https://www.sec.gov/resources-small-businesses/small-business-compliance-guides/modernization-property-disclosures-mining-registrants-small-entity-compliance-guide (last updated Dec. 4, 2018).

[13] Only 125.15 acres were encumbered by the conservation easement, but the remaining contiguous 15 acres that were excluded from the conservation easement were included within the total "before" and "after" valuation.

[*9] best use to be operation of a quarry. Using a discounted cashflow (DCF) analysis, he estimated a before easement FMV of $13.75 million and an after easement FMV of $180,000 (125.15 acres for $125,000 and 15 acres for $55,000), resulting in a net, rounded, conservation easement FMV of $13.57 million.

On August 26, 2016, GR Investors entered into a mining management and consulting agreement with Curtis Colwell, a Georgia resident of Colwell Construction Co. (Colwell Construction). The purpose of the agreement was to "engage Contractor [Curtis] to oversee all 'critical path' aspects of the Operating Mine [Green Rock Property]." Colwell Construction was engaged to provide services such as procuring necessary licenses and permits, quarry design and development, plant operations, market strategy, and quality control of products and inventory. Colwell Construction estimated a first-year $8.75 per-ton crushing price for +100,000 tons with an additional $1.75 per ton for washing the crushed rock. An annual three percent price increase was added after the second year. Further, the equipment hourly rates ranged from $130 to $225. Colwell Construction estimated the explosive and drilling cost ranged from $1.25 to $2 per ton.

As mentioned above, the Seefrieds purchased 335.28 acres on August 21, 2012, and divided the land into Green Rock North and Green Rock South. In 2015 Green Rock South, approximately 193.44 acres, was encumbered with a conservation easement. Mr. Hayter appraised 683.87 acres[14] of land in Meriwether County which was owned by the Seefrieds for the placement of the conservation easement on Green Rock South. The total 683.87 acres valued by Mr. Hayter included the Green Rock Property. Mr. Hayter determined in 2015 that the highest and best use of the 193.44 acres of Green Rock South was as an aggregate quarry; however, for the remaining property adjacent to Green Rock South, including Green Rock North, Mr. Hayter concluded its highest and best use in 2015 was for agriculture.

B.    *Harman Road Property*

Harman Road hired Premier Drilling, LLC (Premier Drilling), to drill on the Harman Road Property beginning on August 17 and ending on August 22, 2016. The drilling included five borings of approximately 30 to 180 feet. Testing, Engineering & Consulting Services, Inc.

---

[14] The total 683.87 acres include the 335.28 acres the Seefrieds purchased in 2012 and their additional undeveloped land in Meriwether County.

[*10] (TEC Services), conducted laboratory tests on two representative samples from the borings to test the quality of the granite stone as being construction grade aggregate.

Mr. Welton retained Mr. Capps to prepare a mineral valuation of the proposed Harman Road aggregate quarry. On October 16, 2016, Mr. Capps concluded that the value of the Harman Road Property's mineral reserve is $17.5 million, rounded. Mr. Capps's valuation estimated annual sales of 150,000 tons of crushed stone aggregate in year 1, 250,000 tons in years 2 and 3, and 300,000 tons sold annually beginning in year 4 over the 25-year life of the quarry.

Harman Road hired the law firm Kowan & Cordon to represent Mr. Welton and assist with the donation of the Harman Road Property. Kowan & Cordon recommended hiring two appraisers; therefore, Harman Road hired Mr. Hayter and Clay Weibel to appraise the Harman Road Property. Harman Road, however, ultimately relied on the conclusions reached in Mr. Hayter's appraisal. Mr. Hayter performed a preliminary appraisal report of the Harman Road Property dated October 27, 2016, for a valuation date of December 15, 2015. Mr. Hayter also prepared a final appraisal dated June 20, 2017, for a valuation date of December 9, 2016, which was attached to Harman Road's 2016 tax return. He appraised the Harman Road Property's entire 191.61 acres.[15] Mr. Hayter concluded that the highest and best use of the Harman Road Property was the operation of a granite aggregate quarry. Under a DCF analysis he determined a before easement FMV of $18.6 million and an after easement FMV of $300,000, rounded (181.61 acres for $255,000 and 10 acres for $42,000), resulting in a net, rounded, conservation easement FMV of $18.3 million.

On October 7, 2016, HR Investors entered into a mining management and consulting agreement with Mr. Colwell of Colwell Construction. As with the Green Rock Property, Colwell Construction was engaged "to oversee all 'critical path' aspects of the Operating Mine [Harman Road Property]." Colwell Construction was engaged to provide services such as procuring necessary licenses and permits, quarry design and development, plant operations, market strategy, and quality control of products and inventory. Colwell Construction estimated a first-year $8.75 per-ton crushing price for +100,000 tons with an

---

[15] Only 181.61 acres were granted for the conservation easement, and the contiguous 10 acres that were excluded from the conservation easement were included within the "before" and "after" valuation.

[*11] additional $1.75 per ton for washing the crushed rock. An annual three percent price increase was added after the second year. Further, the equipment hourly costs ranged from $120 to $235 per ton.

C. *Meriwether County Officials*

1. *Jamie Lancaster*

Jamie Lancaster worked in the surface mining unit at the Georgia Environmental Protection Division (Division). The surface mining unit permits and conducts compliance inspections for permitted and unpermitted surface mines in Georgia. The permit process requires an application and submission of a mining land use plan. While Ms. Lancaster worked in the Division, it received and approved an average of 30 to 40 surface mining unit permit applications annually. If an applicant fails to provide all the details that the Division requires, then the Division requests that the applicant include the information in the plans before approval. However, she clarified that if the mine application did not have the appropriate county zoning, the Division would not approve the mining permit.

2. *Theron Gay*

In 2016 Theron Gay served as the Meriwether County Interim Administrator assisting the Meriwether County Planning and Zoning department.

In 2016 there was no zoning category in Meriwether County that allowed a quarry. Mr. Gay explained that an application for constructing and operating a quarry in 2016 would require a request to the board of commissioners of Meriwether County (Board) to create a category to allow rock and mineral extraction to be part of the zoning ordinance.[16]

Mr. Gay also explained that once a zoning category for a quarry is created, then an application for rezoning at the property will be proposed to the planning and zoning commission for approval, and the approval process will also call for a public hearing. After the planning and zoning commission makes a recommendation, it passes the zoning application to the Board for approval, which also conducts a public hearing.

---

[16] The Board can create zoning categories such as an allowable use or a special use.

[*12]     3.     *Ashley Cole*

Ashley Cole is a native of Coweta County and has been familiar with Meriwether County throughout his life. During 2016 Mr. Cole was working with Georgia's Department of Human Services. Currently, Mr. Cole is the executive director for projects with the Meriwether County Industrial Development Authority (Development Authority).

As of 2023 Meriwether County is the 23rd largest county in the state with around 500 miles of locally maintained roads. Mr. Cole testified that road maintenance has always been an issue in Meriwether County, and in 2019 Meriwether County implemented the Transportation Special Purpose Local Option Sales Tax (TSPLOST) dedicated to funding transportation improvements. However, Meriwether County did not begin working on transportation improvement until 2019 with the passage of TSPLOST.

4.     *Lucy Jane Fryer*

Lucy Jane Fryer joined the Development Authority in 2011. The Development Authority recruits businesses, assists existing industries, and manages any projects in Meriwether County. Ms. Fryer's role in the Development Authority in 2016 included attracting industry and businesses around the industrial park[17] to create jobs and generate additional tax revenue.

D.     *Prior Rezoning in Meriwether County*

Robert Norman is a practicing attorney in Georgia with experience in local zoning and land use in Meriwether County.

From 2006 to 2009 Mr. Norman helped rezone a solid waste disposal facility in Meriwether County from low density residential to industrial. Mr. Norman negotiated a host agreement and was approved for zoning and permitting; however, rezoning was initially met with opposition by a group whose appeal to the Fulton Superior Court led to the developer ultimately prevailing. The developer of the solid waste disposal facility donated a large amount of land to Meriwether County for the industrial park as part of the rezoning process.

---

[17] The industrial park was land donated by a landfill to Meriwether County for an industrial park in the northern portion of Meriwether County.

[*13] IV. *Green Rock Property and Harman Road Property Conservation Easements*

A. *Green Rock Property*

On November 9, 2016, GR Investors released a Confidential Private Placement Memorandum (Green Rock PPM) which offered up to 271 units for $10,000 per unit, a minimum aggregate offering of $1.81 million and a maximum aggregate offering of $2.71 million. The Green Rock PPM identified three business plans for the Green Rock Property: (1) a Development Plan which would develop and operate a commercial mining operation on the Property; (2) an Investment Plan, which would hold the Green Rock Property for investment and long-term capital appreciation; and (3) a Green Plan, which would place a conservation easement on a portion of the property, perpetually preserving the conservation values of the property, and receiving a tax deduction in exchange. Under the Green Plan the FMV of the conservation easement was $13.57 million.

The Green Rock PPM offered Mr. Hayter's November 7, 2016, preliminary appraisal as an exhibit. Further, Green Rock PPM's "Risk Factors and Special Consideration" section details that "there can be no assurance that such permits, license, and approvals will be obtained" regarding operating the property as a quarry.

The total capital raised for the transaction was $2.685 million, and Paul was paid $1,002,300 by Mr. Seefried for the promotion of the conservation easement. On December 27, 2016, Green Rock contributed the Green Rock Property, 125.15 acres, as a conservation easement to Oconee River Land Trust.[18]

Green Rock filed Form 1065 for its short tax year 2016 beginning on September 8 and ending December 31, 2016, and it was the initial and technical termination return. Richard Atkins, with Frazier & Deeter, was the accountant and tax consultant who prepared Green Rock's Form 1065. Form 8283, Noncash Charitable Contributions, was attached to Form 1065 and claimed a $13.57 million deduction for a conservation easement under section 170(h). Supplemental documentation attached to Form 8283 included Mr. Hayter's final appraisal, dated April 3, 2017.

---

[18] The remaining contiguous 15 acres were excluded from the conservation easement.

**[\*14]** On July 23, 2020, respondent notified Paul by FPAA that Green Rock's noncash charitable contribution deduction of $13.57 million was disallowed.

### B.    *Harman Road Property*

On November 8, 2016, HR Investors released a Confidential Private Placement Memorandum (Harman Road PPM) which offered up to 394 units for $10,000 per unit, a minimum aggregate offering amount of $2.44 million and a maximum aggregate offering amount of $3.94 million. The Harman Road PPM identified three business plans for the Harman Road Property: (1) a Development Plan, which would develop and operate a commercial mining operation on the property; (2) an Investment Plan, which would hold the Harman Road Property for investment and long-term capital appreciation; and (3) a Green Plan, which would place a conservation easement on a portion of the property, perpetually preserving the conservation values of the property, and receiving a tax deduction in exchange. Under the Green Plan the FMV of the conservation easement was $18.3 million.

The Harman Road PPM offered Mr. Hayter's October 27, 2016, preliminary appraisal as an exhibit. Further, Harman Road PPM's "Risk Factors and Special Consideration" section details that "there can be no assurance that such permits, license, and approvals will be obtained" regarding operating the property as a quarry.

The total capital raised for the transaction was $3.94 million. On December 9, 2016, Harman Road contributed the Harman Road Property, 181.61 acres, as a conservation easement to Oconee River Land Trust.[19]

Harman Road filed Form 1065 for its short tax year 2016 beginning October 26 and ending December 16, 2016 (Short Year Return), and a second Form 1065 for its short tax year 2016 beginning December 17 and ending December 31, 2016. Harman Road filed Form 8082, Notice of Inconsistent Treatment or Administrative Adjustment Request, to change the beginning of its tax year from December 17 to November 29, 2016, and ending December 31, 2016. The change on the return updated the dates of the Short Year Return to represent a

---

[19] The remaining contiguous 10 acres were excluded from the conservation easement.

**[\*15]** technical termination on November 28, 2016. Both returns were prepared by Michel P. Pompilio of Moore, Colson & Co., P.C.

The Short Year Return's Schedule M–2 reports the cost basis of the Harman Road Property, 191.61 acres, as $476,534 with a built-in gain of $1,069,858.[20] On the December 31, 2016, yearend Form 1065, Harman Road claimed a noncash charitable contribution deduction of $18.3 million. Form 8283 was attached to the December 31, 2016, yearend Form 1065, which reported an $18.3 million deduction for a conservation easement under section 170(h). Documentation attached to Form 8283 included Mr. Hayter's final appraisal, dated June 20, 2017.

On July 16, 2020, respondent notified CCP II by FPAA that Harman Road's noncash charitable contribution deduction of $18.3 million was disallowed.

V.     *Expert Testimony Presented at Trial*

    A.     *Green Rock Property and Harman Road Property Highest and Best Use*

The Partnerships offered expert witness testimony from Gregory Stanish, director of geological services with John T. Boyd Co. Mr. Stanish is a registered member of the Society of Mining, Metallurgy, and Exploration (SME), is a licensed professional geologist in the State of New York, and is a Qualified Person. He was accepted by the Court as an expert in geology and the evaluation of construction aggregates.

The Partnerships retained Mr. Stanish to work with Michael Wick in developing independent estimates of resources and reserves of granite on the Properties. Mr. Stanish assumed that all regulatory permits and approvals could be obtained to operate surface mining operations on the Properties.

Mr. Stanish's Green Rock Property evaluation was dependent on Terracon's drilling campaign and laboratory testing. Mr. Stanish's Harman Road Property evaluation was based on Premier Drilling's drilling campaign and TEC Services' laboratory testing. Terracon's and TEC Services' laboratory testing similarly concluded that the core samples from the Properties met Georgia Department of Transportation

---

[20] Petitioners assert that the $476,534 cost basis of the Harman Road Property was calculated by a certified public accountant on the basis of Meriwether County land values in 2003—when Mr. Harman acquired the property through his inheritance.

**[*16]** (GDOT) Group II, Class A Aggregate specifications.[21] Mr. Stanish's reports assert that the laboratory results from the Properties suggest there is little variability in physical characteristics of the core samples.

Mr. Stanish concluded that the Properties' drilling and testing campaigns provide a reasonable basis to evaluate the geologic occurrence. He determined that on the Green Rock Property there is a sandy overburden and weathered granite "rind" ranging from zero to ten feet. He concluded that Harman Road Property has an overburden thickness of 23 feet within the mineable pit area.

Mr. Stanish relied on the 2014 SME Guide for Reporting Exploration Results, Mineral Resources, and Mineral Reserves, to estimate the total mineral resources and reserves on the Properties. SME defines a mineral resource as "a concentration or occurrence of solid material of economic interest in or on the Earth's crust in such form, grade or quality and quantity that there are reasonable prospects for eventual economic extraction." Mineral resources are subdivided into inferred mineral resource, indicated mineral resource, and measured mineral resource.[22]

A mineral reserve is defined as "the economically mineable part of a measured and/or Indicated Mineral Resource. It includes diluting materials and allowances for losses, which may occur when the material is mined or extracted and is defined by appropriate level of study at Pre-Feasibility, Feasibility, or equivalent, that includes the application of Modifying Factors." Modifying factors that are applied to a mineral reserve include mining methods such as surface mining, recovery factors such as processing losses, economics, markets, legal, environmental, infrastructure, social, and governmental factors. Mineral reserves are

---

[21] Group II Aggregate consist of slag, gravel, granitic and gneissic rock, quartzite, synthetic aggregate, or any combination thereof. Class A and class B aggregates are used in Portland cement concrete, asphaltic concrete, and bituminous surface treatment; "B" Grading aggregates are used in all applications other than Portland cement concrete, asphaltic concrete, or bituminous surface treatments.

[22] An inferred mineral resource has a lower level of confidence than that applying to an indicated mineral resource and must not be converted to a mineral reserve. An indicated mineral resource has a lower level of confidence than that applying to a measured mineral resource and may only be converted to a probable mineral reserve. A measured mineral resource has a higher level of confidence than applying to either an indicated or inferred mineral resource.

[*17] broken into probable mineral reserves and proven mineral reserves as follows.[23]



Inset 4.1 – Relationship between Mineral Resources and Mineral Reserves.

Mr. Stanish determined the resources on both Properties would be classified as indicated resources. In conclusion Mr. Stanish estimated that approximately 13.7 million run-of-mine (ROM) tons[24] of probable granite reserves are present within the proposed mining pit area of the Green Rock Property, and approximately 10 million ROM tons of probable granite reserves are present within the proposed mining pit area of the Harman Road Property.

Mr. Stanish's reports provided a preliminary quarry site layout for the Properties on the basis of the conducted drilling and testing. The preliminary quarry site layouts for the Properties illustrate a proposed surface layout, the completed drilling locations, and the reserve classification—probable granite. Below is Mr. Stanish's conceptual preliminary quarry site layout for the development of the Green Rock Property and the Harman Road Property:

---

[23] Proven mineral reserve implies a high degree of confidence in the modifying factors whereas probable mineral reserve is a lower confidence in applying the modifying factors than that of proven mineral reserve.

[24] ROM is the portion of material that is physically excavated from the in-place portion of a mineral deposit.

**[*18]**



Green Rock Property

[*19]



Harman Road Property

**[\*20]** The Partnerships offered expert witness testimony from Mr. Wick, director of industrial minerals and vice president of John T. Boyd Co. Mr. Wick is Six-Sigma Greenbelt Certified and is classified as a Competent Person (CP)[25] in the United States. He was accepted by the Court as an expert in the crushed stone aggregate industry, mineral market analysis, and valuation of mineral reserves.

The Partnerships retained Mr. Wick to separately evaluate the resources on the Green Rock Property and the Harman Road Property. Mr. Wick's mineral property evaluations are likewise predicated on the expectation that necessary regulatory permits for operating a quarry on the Properties are obtained. For the Green Rock Property, Mr. Wick assumes that "[t]here are not any other granite operations being developed concurrently with the Green Rock Property in the general market area as of the valuation date." However, for the Harman Road Property Mr. Wick makes the additional contradictory assertion that "[t]here are not any other granite operations being developed concurrently with the Harman Road Property in the general market area as of the valuation date."

Mr. Wick developed operating plans (mining and processing) for the Properties. For the Green Rock Property's operating plan, Mr. Wick determined a mine life of 23 years. For the Harman Road Property's operating plan, Mr. Wick determined a mine life of 18 years.

In addition to the operating plans Mr. Wick performed market analyses to assess the supply, demand, pricing, and logistics for granite stone production for the Properties. Mr. Wick concluded that for both the Green Rock Property and the Harman Road Property there were opportunities for supplying "local markets." Mr. Wick defined the "local markets" on both reports as consisting of three submarkets including nearby markets of Meriwether, Troup, and Heard Counties; markets trending southward including Harris and portions of Talbot and Pike Counties; and a smaller market near Atlanta which encompasses Coweta, Fayette, Fulton, and Spalding Counties.

Mr. Wick performed the market analyses for the Properties by estimating a per capita stone consumption of 5.23 tons per person multiplied by the population in each county he considered to be within

---

[25] SME 2017 guidelines require that a CP perform the mineral resource/reserve evaluation and the appraisal. "A Competent Person must have a minimum of five years relevant experience in the style of mineralization and type of deposit under consideration and in the activity which that person is undertaking."

[*21] the defined "local markets." Mr. Wick concluded that for both the Green Rock Property and the Harman Road Property there is an overall market demand of approximately 7.85 million tons of aggregate per year.

Mr. Wick concluded the highest and best use for the Properties was the operation of a quarry. Therefore, he developed an opinion of the values for the Properties by using DCF analysis. Overall, Mr. Wick concluded a value for the Green Rock Property of $19.6 million and a value for the Harman Road Property of $16.4 million.

In rebuttal respondent offered opinion testimony from Brian Groff with Groff Engineering & Consulting. He was tasked with reviewing Mr. Stanish's and Mr. Wick's reports. Mr. Groff is a Qualified Person[26] for reporting mineral reserves, and he holds a professional engineer's license in Alabama, Florida, Georgia, Iowa, Illinois, Indiana, Kansas, Kentucky, Louisiana, Missouri, North Carolina, Nebraska, Ohio, Tennessee, Texas, Virginia, and West Virginia. Mr. Groff is a professional engineer and a certified mineral appraiser and was recognized by the Court as an expert in construction aggregates and mining engineering, as well as mineral resource and reserve valuation. Mr. Groff concluded that the Properties' FMVs are substantially less than the values determined by Mr. Stanish and Mr. Wick.

Mr. Groff separately identified problems with Mr. Stanish's and Mr. Wick's DCF analyses. Mr. Groff asserted that the geology was not unique to the Properties, the drilling performed was minimal, and the testing method used was not consistent with industry practice. Therefore, Mr. Groff concluded that the Properties' testing does not reasonably represent a hypothetical quarry. Similarly, Mr. Groff rebuts Mr. Stanish's classification that the resources are an indicated mineral reserve, and he questioned whether the Properties could acquire zoning approval from Meriwether County in a timely manner.

In addition Mr. Groff determined that Mr. Wick's DCF analyses of the Properties are evaluations of hypothetical businesses and not true valuations of mineral properties. Mr. Groff concludes that Mr. Wick's data is inaccurate because Meriwether County did not have indicators suggesting increasing demand for construction aggregate since

---

[26] According to guidelines from SME, the Committee for Mineral Reserves International Reporting Standards uses different terms for Competent Person; e.g., Canada (Qualified Person). This alternative term is directly equivalent to Competent Person.

[*22] population estimates show a declining or negative population growth. Moreover, Mr. Groff concluded that the Properties could each reasonably sell approximately 300,000 tons of aggregate per year. Further, Mr. Groff opined that Mr. Wick's DCF analyses ignored known risks. These risks, which Mr. Groff considered to be virtual certainties, included the possibility of delayed permit approvals, problems encountered during mine development, unexpected market downturns, and competition from other new market participants.

Regarding the market or sales comparison approach, Mr. Groff opines:

> Mr. Wick's report offers no comparable sales but rather explains the difficulty in finding such transactions. Georgia is a full disclosure state, meaning consideration given for property transactions is public information (footnote omitted) . . . . One should reasonably be able to find comparable sales for undeveloped lands with a reasonable probability of having the same bedrock geology . . . .
>
>     . . . .
>
>     . . . Drilling and testing, especially of the nature completed in this matter, would have reasonably cost less than $50,000.00 to conduct (footnote omitted) and only provide a level of verification, albeit a low level, that the property has granitic gneiss, typical of many properties in this part of the Georgia Piedmont region. My opinion is that drilling and testing (i.e., geoscientific information) do not add significant value to the land and mineral interests of the Subject Property. Approved permits, in addition to geoscientific information, add value.

Finally, Mr. Groff contends that the Partnerships' experts do not present FMVs for the mineral interests on the Properties as there are several risks that were not mitigated or accounted for in the valuations.

### B. *Values of Green Rock Property and Harman Road Property Before the Granting of Conservation Easements*

The Partnerships also offered expert testimony from Douglas Kenny, an MAI appraiser with Kenny & Associates, Inc. Mr. Kenny is a state certified general real property appraiser in Alabama, California, Colorado, Florida, Georgia, Illinois, Kentucky, Louisiana, Maine,

[*23] Mississippi, Missouri, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, West Virginia, and Wisconsin. He was accepted by the Court as an expert in real estate appraisal, including mineral properties.

Using the before and after method, Mr. Kenny provided an opinion of values for the Properties' conservation easements.[27] For the before valuations Mr. Kenny used the DCF analysis, the royalty method, and the sales comparison approach.[28] Mr. Kenny determined the after valuations under the sales comparison approach.[29]

In his analyses Mr. Kenny assumes "that all required licenses, consents, or other legislative or administrative authority from any local, state, national government or private entity or organization can be obtained or renewed for any use on which the value estimate contained in this report is based." Mr. Kenny also relied on the findings of Mr. Wick and Mr. Stanish as well as other subsurface minerals reports from across the Southeast from other mining experts. Mr. Kenny concluded the highest and best use for the Properties was the operation of a quarry.

Mr. Kenny's DCF analysis for the Green Rock Property assumed a 25-year mine schedule and a total granite production of approximately 13,772,000 tons. His DCF analysis for the Harman Road Property assumed a 20-year mine schedule and a total granite production of approximately 10,018,000 tons.

Further, in his DCF analyses he concludes annual production begins in year 3 with 99,750 tons sold for both Properties and subsequent annual sales increasing and ranging from more than 505,000 tons to 700,000 tons sold annually over 25 years for the Green

---

[27] The appraisal report for the Green Rock Property, 140.15 acres, refers to the 125.15 acres encumbered by the conservation easement and the 15 acres excluded from the conservation easement. The appraisal report for the Harman Road Property, 191.61 acres, refers to the 181.61 acres encumbered by the conservation easement and the 10 acres excluded from the conservation easement.

[28] The before valuation of Green Rock Property included the entire 140.15 acres, 125.15 encumbered by the conservation easement and the contiguous 15 acres excluded from the conservation easement, and the before valuation for Harman Road Property included the entire 191.61 acres, 181.61 acres encumbered by the conservation easement and the contiguous 10 acres excluded from the conservation easement.

[29] For the after valuation of the Properties Mr. Kenny separately analyzed the area encumbered by the conservation easement plus the area excluded by the conservation easement.

[*24] Rock Property and 500,000 to more than 600,000 tons sold annually over 20 years for the Harman Road Property. Mr. Kenny opines the per-ton sale prices of aggregate would range from $15.91 in year 3 for the Properties to $30.49 in year 25 for the Green Rock Property and $26.30 for the Harman Road Property in year 20. Mr. Kenny calculated a negative cashflow through year 2 for the Properties, but he calculated a net annual income of $6,428,451 by year 25 for the Green Rock Property and net annual income of $6,355,027 by year 20 for the Harman Road Property. Mr. Kenny concludes, under his DCF analyses, the value for the Green Rock Property over a 25-year mine life is approximately $17,054,827 and the value of the Harman Road Property is approximately $14,541,043.

Mr. Kenny also offered a royalty method to incorporate an additional, secondary income approach. Mr. Kenny determined the value under the royalty method for the Green Rock Property is $15,073,372, and for the Harman Road Property, $11,453,377.

Mr. Kenny also used the sales comparison approach to compare properties with similar highest and best uses. The comparable property sales results were the same for both Properties. He compared seven land sales in Georgia or Tennessee that were either operating quarries or which were "greenfield"[30] sites purchased for quarry development or expansion. The dates of the sales ranged from June 2006 to September 2023, and with purchase prices ranging from $3,678,725 to $99,310,000.

Mr. Kenny's sales comparison approach included adjustments to the land sales based on various dissimilar features and investment characteristics.[31] Mr. Kenny concluded a value range, correlated and rounded, for the Green Rock Property between $11.6 million and $21.34 million, and the value range, correlated and rounded, for the Harman Road Property between $9.62 million and $24.08 million.

Mr. Kenny reviewed the FMV valuations arrived at through DCF analysis, royalty method, and sales comparison approach; however, he ultimately concluded that the DCF analysis is the appropriate method to evaluate the before conservation easement FMVs of the Properties.

---

[30] A greenfield is an undeveloped land site that has not previously been built on.

[31] Transactional adjustments include property rights conveyed, financing terms, and market conditions. Physical adjustments include location, development status/permitting, nearby competition, on-site wetlands, access to transportation routes, and utility.

**[*25]** Moreover, Mr. Kenny's value of the Green Rock Property before the conservation easement is $17.05 million, rounded, and the value of the Harman Road Property before the conservation easement is $14.54 million, rounded.

Respondent offered expert testimony by Edmond G. Eslava of the Appraisal & Consultant Group, Inc., to determine the FMV of the Properties. He likewise offered before and after conservation easement values. Mr. Eslava is an MAI, SRA, and ASA, and he is a certified real estate appraiser in Alabama, Mississippi, and Georgia. Mr. Eslava was accepted by the Court as an expert in appraisals and appraisal review.

Mr. Eslava concluded that the highest and best use for the Properties was to hold them vacant for continued use for timber and agricultural, with the added use of low density residential and recreational purposes. Mr. Eslava's sales comparison approach for the Properties is based on his determination of their highest and best use.[32]

For the Green Rock Property Mr. Eslava selected five land sales as sales of comparable properties. All were in Meriwether County and had the highest and best use of timber, recreational, agricultural, or low density residential sites. The prices of the five sale properties ranged from approximately $1,762 per acre to $3,386 per acre, and the dates of sales ranged from July 2016 to March 2017.

For the Harman Road Property, Mr. Eslava chose five different land sales as comparable; all were in Meriwether County and had the highest and best use of timber, recreational, agricultural, or low density residential sites. The prices of these five properties ranged from approximately $2,420 per acre to $3,718 per acre, and the dates of the sales ranged from November 2015 to July 2017.

Mr. Eslava made adjustments for all of the comparable land sales based on (1) marketing conditions (time) adjustments for property value increases during the timeframe, (2) size adjustments, (3) location/access, and/or (4) improvements to the land. After these adjustments, Mr. Eslava concluded that the Green Rock Property had a before conservation easement value of $2,500 per acre for a total FMV of $313,000, rounded, and the Harman Road Property had a before

---

[32] Mr. Eslava, unlike Mr. Kenny, analyzed only the land encumbered by the conservation easement and not the total contiguous properties—125.15 acres for the Green Rock Property and 181.61 acres for the Harman Road Property.

[*26] conservation easement value of $3,000 per acre for a total FMV of $545,000, rounded.

Respondent also offered expert witness testimony from Raymond H. Krasinski, an MAI appraiser employed with the IRS. He was asked to review the appraisal reports for the Properties prepared by Mr. Hayter (Hayter Reports). Mr. Krasinski was accepted by the Court as an expert in appraisals, appraisal review, the Uniform Standards of Professional Appraisal Practice (USPAP), and market analysis.

Mr. Krasinski points out several issues in the Hayter Reports to ultimately conclude that the Hayter Reports are misleading and should not be relied on. He opines that the Hayter Reports omit multiple comparable land sales in the local market area and assume a market participant will pay the same price for a property that has full legal permits in place as for a property that requires a zoning change. Second, Mr. Krasinski opines that the Hayter Reports improperly apply the extraordinary assumption that proper zoning for the Properties will be granted, which obfuscates total risk and affects value. Next, Mr. Krasinski concludes that the DCF analyses violate USPAP since they produce erroneous business values for an operating surface mine. Ultimately, Mr. Krasinski concludes that the Hayter Reports fail to comply with generally accepted appraisal practices and USPAP, and the Hayter Reports are not credible.

C.    *Values of Green Rock Property and Harman Road Property After the Granting of Conservation Easements*

Mr. Kenny uses the sales comparison approach to determine the Properties' FMVs after the encumbrance of the conservation easement. Mr. Kenny determined the highest and best use for the Green Rock Property's contiguous 15 acres and the Harman Road Property's contiguous 10 acres, both parcels excluded from the conservation easements, are agricultural/residential development. Under the sales comparison approach he concluded that the value of the Green Rock Property's 15 acres, correlated and rounded, is $80,000, and the Harman Road Property's 10 acres, correlated and rounded, is $50,000.

Further, Mr. Kenny concludes that the highest and best uses of the Green Rock Property's remaining 125.15 acres and the Harman Road Property's remaining 181.61 acres after encumbrance by the conservation easements are agricultural or forestry use, recreational use

**[\*27]** as outlined by the conservation easement, or conservation of the land for public enjoyment and preservation of natural forested areas.

Under the sales comparison approach Mr. Kenny analyzes the same six comparable property sales for the Properties. The six sale properties are in either Alabama or Georgia and have encumbering conservation easements ranging from 64 acres to 242.49 acres. After adjustments, Mr. Kenny estimated the total after conservation easement FMV for the Green Rock Property, correlated and rounded, is $190,000, and the estimated after conservation easement total FMV for the Harman Road Property, correlated and rounded, is $270,000.

Mr. Kenny concludes that the total after conservation easement FMV of the Green Rock Property is $270,000 ($190,000 for 125.15 acres plus $80,000 for 15 acres). Further, the total after conservation easement FMV of the Harman Road Property is $320,000 ($270,000 for 181.61 acres plus $50,000 for 10 acres). Overall, Mr. Kenny concluded that the FMVs of the conservation easements for the Green Rock Property and the Harman Road Property are $16.78 million and $14.22 million, respectively.

Mr. Eslava also determines the FMVs of the Properties after the encumbrance of the conservation easements under the comparable property sales method. Mr. Eslava uses the same five comparable property sales for the Green Rock Property and the Harman Road Property. His five comparable properties were in central and northern Georgia. They ranged in parcel size from 111.71 to 368.69 acres, and their sale dates ranged from July 2017 to March 2020. Mr. Eslava's first four properties were encumbered with conservation easements, and the sale price of the fifth was adjusted downward for lack of a conservation easement. After adjustments, Mr. Eslava estimates the total after conservation easement FMVs for the Green Rock Property and the Harman Road Property are $232,000 and $400,000, respectively. Overall, Mr. Eslava concluded that the FMVs of the conservation easements for the Green Rock Property and the Harman Road Property are $81,000 and $145,000, respectively.

**[*28]**                                    OPINION

I.     *Burden of Proof*

Ordinarily, the taxpayer bears the burden of proving that the Commissioner's determinations are erroneous.[33] Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Crescent Holdings, LLC v. Commissioner*, 141 T.C. 477, 485 (2013). That burden includes proving entitlement to any deductions claimed. *See INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934). Petitioners therefore generally bear the burden of proving the Partnerships' entitlement to the claimed charitable contribution deductions for qualified conservation easement contributions under section 170 as well as the burden of proving the value of the conservation easements.

II.     *Qualified Contributions*

Section 170(a)(1) allows a deduction for any charitable contribution made within the taxable year. The Code generally restricts a taxpayer's charitable contribution deduction for donations of "an interest in property which consists of less than the taxpayer's entire interest in such property." I.R.C. § 170(f)(3)(A). That means someone who owns property and donates to charity only a partial interest in that property may not claim a charitable contribution deduction for that donation. However, the statute provides an exception—and allows a deduction—for a "qualified conservation contribution." I.R.C. § 170(f)(3)(B)(iii). Section 170(h)(1) defines a "qualified conservation contribution" to be (1) the contribution of a "qualified real property interest" (2) to a "qualified organization" (3) "exclusively for conservation purposes."

The parties here do not dispute that the Partnerships' donations of conservation easements satisfied the elements of "qualified conservation contribution[s]" and met the other requirements under

---

[33] As to the burden of production section 7491(c) provides that the Commissioner "shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount." However, section 7491(c) does not apply to TEFRA partnership-level proceedings such as these cases. *See Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 234 (2018). Therefore, petitioners bear not only the burden of proof but also the burden of production even as to any penalty.

[*29] section 170. The central issue in these cases is the FMVs of the conservation easements donated by Harman Road and Green Rock.

III.     *FMV of the Conservation Easements*

A.     *Valuation Principles*

Generally, the amount of a charitable contribution deduction under section 170(a) for a donation of property is the FMV of the property at the time of the donation. Treas. Reg. § 1.170A-1(c)(1). Treasury Regulation § 1.170A-1(c)(2) defines FMV as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." With respect to valuing a donation of a partial interest in property Treasury Regulation § 1.170A-7(c) provides that "[e]xcept as provided in § 1.170A-14, the amount of the deduction under section 170 . . . is the [FMV] of the partial interest at the time of the contribution." Treasury Regulation § 1.170A-14(h)(3)(i) in turn sets forth the following method for valuing a perpetual conservation restriction:

> If there is a substantial record of sales of easements comparable to the donated easement (such as purchases pursuant to a governmental program), the [FMV] of the donated easement is based on the sales prices of such comparable easements. If no substantial record of market-place sales is available to use as a meaningful or valid comparison, as a general rule (but not necessarily in all cases) the [FMV] of a perpetual conservation restriction is equal to the difference between the [FMV] of the property it encumbers before the granting of the restriction and the [FMV] of the encumbered property after the granting of the restriction. The amount of the deduction in the case of a charitable contribution of a perpetual conservation restriction covering a portion of the contiguous property owned by a donor and the donor's family . . . is the difference between the [FMV] of the entire contiguous parcel of property before and after the granting of the restriction.

The FMV of property on a given date is a question of fact to be resolved on the basis of the entire record. *McGuire v. Commissioner*, 44 T.C. 801, 806–07 (1965); *Kaplan v. Commissioner*, 43 T.C. 663, 665

**[\*30]** (1965). In these cases we do not have "a substantial record of sales of easements comparable to the donated easement[s]," and we will therefore base our valuations on the before and after method. *See* Treas. Reg. § 1.170A-14(h)(3)(i). Treasury Regulation § 1.170A-14(h)(3)(ii) provides:

> If before and after valuation is used, the [FMV] of the property before contribution of the conservation restriction must take into account not only the current use of the property but also an objective assessment of how immediate or remote the likelihood is that the property, absent the restriction, would in fact be developed, as well as any effect from zoning, conservation, or historic preservation laws that already restrict the property's potential highest and best use.

The highest and best use is one that is a "reasonable and probable use that supports the highest present value," with a "focus . . . on 'the highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future.'" *TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th 1354, 1369 (11th Cir. 2021) (quoting *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d 982, 987 (11th Cir. 2016), *aff'g in part, rev'g in part and remanding* T.C. Memo. 2014-79); *accord Olson v. United States*, 292 U.S. 246, 255 (1934). "Because property owners have an economic incentive to put their land to its most productive use, a property's [highest and best use] is presumed to be its current use absent proof to the contrary." *Ranch Springs, LLC v. Commissioner*, 164 T.C. 93, 136 (2025) (first citing *United States v. Buhler*, 305 F.2d 319, 328 (5th Cir. 1962); and then citing *Mountanos v. Commissioner*, T.C. Memo. 2013-138, at \*7, *supplemented by* T.C. Memo. 2014-38, *aff'd*, 651 F. App'x 592 (9th Cir. 2016)). When the parties propose different uses for the property, we are to consider whether there is "too high a chance that the property will not achieve the proposed use in the near future" as causing the use to be too risky to qualify. *TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1369 (quoting *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 1000). In cases such as these our inquiry entails "an objective assessment of how immediate or remote the likelihood is that the property, absent the [conservation] restriction, would in fact be developed, as well as any effect from zoning . . . laws that already restrict the property's potential highest and best use." Treas. Reg. § 1.170A-14(h)(3)(ii). Then, after determining a property's highest and best use,

**[\*31]** our task is to arrive at a value based on that use. *TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1370.[34]

To show the values of the two conservation easements, including their highest and best use before and after the donations of the Properties, the parties have offered the reports and testimony of expert witnesses. *See* Rule 143(g). "Opinion testimony of an expert is admissible if and because it will assist the trier of fact to understand evidence that will determine a fact in issue," and we evaluate expert opinions "in light of the demonstrated qualifications of the expert and all other evidence of value." *Parker v. Commissioner*, 86 T.C. 547, 561 (1986) (citing Fed. R. Evid. 702). Where experts offer competing estimates of FMV, we decide how to weigh those estimates by, among other things, examining the factors they considered in reaching their conclusions. *See Casey v. Commissioner*, 38 T.C. 357, 381 (1962). We are not bound by the opinion of any expert witness, and we may accept or reject expert testimony in the exercise of our sound judgment. *Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 294–95 (1938); *Estate of Newhouse v. Commissioner*, 94 T.C. 193, 217 (1990). We may also reach a decision as to the FMV of a property on the basis of our own examination of the evidence in the record. *See Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), *aff'g* T.C. Memo. 1974-285.

With these principles in mind, we will now explain our valuations of the conservation easements, i.e., the FMVs of the Properties.

B.    *Valuation Analysis*

Petitioners' valuation experts used DCF analysis, the royalty method, and the sales comparison approach to value the Properties before the easements and the sales comparison approach to value the Properties after the easements. Petitioners' valuation experts arrived at several "before value" FMVs of the Green Rock Property which ranged from $19.6 million as concluded by Mr. Wick down to $17.05 million as concluded by Mr. Kenny, and FMVs of the Harman Road Property which

---

[34] "The highest and best use inquiry is one of objective probabilities." *Esgar Corp. v. Commissioner*, 744 F.3d 648, 657 (10th Cir. 2014), *aff'g* T.C. Memo. 2012-35, 2012 WL 371809, and *Tempel v. Commissioner*, 136 T.C. 341 (2011). "While highest and best use can be any realistic, objective potential use of the property, it is presumed to be the use to which the land is currently being put absent proof to the contrary." *Esgar Corp. v. Commissioner*, 2012 WL 371809, at \*7. Where "an asserted highest and best use differs from current use, the use must be reasonably probable and have real market value." *Id.* (citing *United States v. 69.1 Acres of Land*, 942 F.2d 290, 292 (4th Cir. 1991)).

[*32] ranged from $16.4 million as concluded by Mr. Wick down to $14.54 million as concluded by Mr. Kenny. Petitioners' experts assumed the Properties' highest and best use is to operate granite quarries. Respondent's valuation expert concluded that the Green Rock Property's FMV before the easement was no more than $313,000, and the Harman Road Property's FMV before the easement was no more than $545,000. Respondent's experts assumed the Properties' highest and best use is to hold both lands in their vacant status for continued use for timber, agricultural, low density residential, and recreational purposes.

The large disparities in the parties' FMVs for the Properties stem from their disagreements as to the highest and best use of the Properties at the time of the donations, whether the income approach should be used, and the suitability of the comparable property sales used in their respective analyses. Therefore, we must determine the highest and best use of the Properties before the easements and whether the income approach and/or sales comparison approach was appropriate.

C.    *Highest and Best Use Determinations*

1.    *Whether the Proposed Quarries Are Legally and Physically Possible*

The Properties are in rural areas and surrounded by land that continued to be owned by the Seefrieds and the Harmans. The Green Rock Property was zoned for A–1, Agricultural District, and the Harman Road Property was zoned for A–1, Agricultural District, and RR, Rural Reserve District. The Properties were undeveloped when originally purchased and when the conservation easements were placed. Therefore, in 2016 agriculture and rural reserve was the Properties' presumptive highest and best use.

Petitioners assert that the highest and best use of the Properties in 2016 was as granite quarries since there is a "reasonable probability" that the Properties could obtain rezoning and permits for operating granite quarries. Petitioners further their "reasonably probable" argument by relying on Meriwether officials, Ms. Lancaster and Mr. Gay, and Mr. Norman.

In 2016 Meriwether County did not have a zoning category for operating a quarry. Mr. Gay testified that it would have been possible in 2016 to request a new zoning ordinance. Although it is likely that the Partnerships could have obtained a new zoning category of mining in

[*33] 2016 for Meriwether County, petitioners failed to provide concrete evidence that the Properties would have been rezoned.

The Partnerships never submitted a rezoning application or took any other steps toward securing the zoning change that would be required to operate a granite quarry. Further, Mr. Gay testified that any zoning changes would require a public hearing. Respondent contends that there would be large public opposition, as seen in Jerry Fitzgerald's attempt to develop a quarry in Meriwether County; however, we are reluctant to give weight to this evidence since Mr. Fitzgerald's attempt was undertaken after the 2016 tax year. *See Estate of Newhouse*, 94 T.C. at 218; *Pine Mountain Pres., LLP v. Commissioner*, T.C. Memo. 2018-214, at *20 (finding that reasonable probability "is resolved according to the circumstances existing as of the dates of valuation, which are the dates the easements were donated"), *rev'd in part on other grounds*, 978 F.3d 1200 (11th Cir. 2020); *see also Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 998; *Estate of Gilford v. Commissioner*, 88 T.C. 38, 52 (1987) ("[P]roperty is valued as of the valuation date on the basis of market conditions and facts available on that date *without regard to hindsight*.").

Petitioners contend that there would not be large public opposition for rezoning since the quarries would be buffered by surrounding land. Although the Seefrieds own the land surrounding the Green Rock Property, Mr. Harman owns the land surrounding the Harman Road Property. Mr. Harman testified that he "really wouldn't want [a granite quarry] right there" on the Harman Road Property, and he would not have considered the conservation easement transaction if it were to become a quarry.

Furthermore, Mr. Norman testified that he worked on rezoning a landfill in 2006–09 to industrial zoning in Meriwether County. He testified that the rezoning faced public opposition by groups that appealed the rezoning to Fulton County Superior Court. Although the developer prevailed, to fully obtain the rezoning, the developer entered into a host agreement and donated excess land to Meriwether County to develop the industrial park.

Petitioners presented Ms. Lancaster, who testified that there had not been a surface mining permit application that had been rejected while she was working at the Department because "[i]f the applicant has not provided all of the details that we [the Department] require[s] in the regulations, then we come in and ask them [the applicant] to include

**[\*34]** that in the plans before we approve." However, Ms. Lancaster does clarify that a mining permit application that does not have the appropriate zoning in the county would not be approved. Petitioners assume that such permitting would be obtained for the Properties because applications are not normally rejected, but the approvals are based on the presumption that appropriate zoning has been obtained.

In sum, we find the evidence presented inconclusive as to the question of whether development of a quarry mine at the Properties is legally permissible.

Regarding physical permissibility, petitioners argue it is physically possible to mine, on the basis of the drilling campaigns conducted on the Properties. Petitioners' expert, Mr. Stanish, concluded that there were sufficient granite reserves on the Properties that may be mined and that the granite deposits met the GDOT Group II, Class A specification.

Before Green Rock placed a conservation easement on the property it was informed by Dr. Schroeder "that major aggregate producers drill on a much higher density (i.e., closer spacing) than what was done for our study [Green Rock Property] before they commit any economic resources to opening or expanding a quarry operation." Green Rock was made aware during the drilling and testing period that its drilling was not adequate compared to that of major aggregate producers; yet Green Rock did not conduct any further drilling on the property.

Moreover, Mr. Groff opines that drilling on the Properties was minimal and the testing completed on the Properties combined multiple, select interval hole samples. When respondent asked whether it was "unusual for core samples in construction aggregates to be mixed together when they're tested," Mr. Stanish admitted it was unusual but "to save time and money, a lot of samples would be composited." Overall, Mr. Groff concludes that the testing conducted at the Properties was not consistent with industry practice, which is normally to test all intervals planned for mining.

We agree with Mr. Groff and find his testimony to be credible as there was minimal drilling conducted on the Properties and the testing conducted was not consistent with industry practice.

Regarding the actual construction of the quarry, Mr. Stanish's quarry layout for the Harman Road Property shows Flat Shoals Creek

[*35] running through the middle of the potential quarry development. When asked about the creek, the Partnerships' experts assert that "you can build bridges or culverts to get over those" or, if needed, "you could relocate and mitigate the stream, which is expensive." After responses to questions from the Court, we have reservations that a quarry on the Harman Road Property is physically possible since Flat Shoals Creek runs directly through the quarry development. Even if it is physically possible to relocate the stream or build a bridge, we note the specific plan fails to account for the steps that may need to be taken to mitigate the ecological impact on the creek.

Furthermore, we have serious reservations as to the accuracy of Mr. Hayter's highest and best use determination for the Green Rock Property. In 2015 before the conservation easement on the Green Rock Property, the Seefrieds hired Mr. Hayter to appraise Green Rock South and the surrounding land—which included the Green Rock Property. Mr. Hayter's 2015 appraisal concludes that the highest and best use of Green Rock South was as an aggregate granite quarry, but that for the remaining property adjacent to Green Rock South, including Green Rock North, the highest and best use in 2015 was agriculture. We determine that the Hayter Reports lack credibility since Mr. Hayter first determined the highest and best use of the Green Rock Property was agriculture but just one year later, in his 2016 appraisal, concluded the highest and best use was as a granite quarry, without offering an adequate explanation for his changed view.

In response to this major discrepancy, petitioners argue that granite minerals were not known on the Green Rock Property because drilling was not completed during Mr. Hayter's appraisal in 2015. However, the Green Rock Property and Green Rock South were adjacent to each other, and both parcels of land were within the Piedmont province, north of the Piedmont Fall Line—a province that is known to contain weathering-resistant granite bedrock and economically mineable granite mines. Thus, we find it hard to rely on Mr. Hayter's highest and best use for the Green Rock Property when the classification was changed a year after a new conservation easement appraisal was requested.

In sum, we have reservations that it was "reasonably probable" that the Properties could obtain rezoning, and we are equally unconvinced that it was physically possible to develop a quarry on the Harman Road Property. Even if we were to accept that the proposed

**[\*36]** development was both legally and physically permissible at the Properties, we would find this determination not to be controlling.[35]

> 2. *Whether the Proposed Quarries Are Financially Feasible and Maximally Productive*

Since the asserted highest and best use is the extraction of minerals, petitioners must show the presence of minerals in commercially exploitable volumes and the existence of a market "that would justify [mineral] extraction in the reasonably foreseeable future." *69.1 Acres of Land*, 942 F.2d at 292; *accord Cloverport Sand & Gravel Co. v. United States*, 6 Cl. Ct. 178, 198–99 (1984). "There must be some objective support for the future demand, including volume and duration. Mere physical adaptability to a use does not establish a market." *United States v. Whitehurst*, 337 F.2d 765, 771–72 (4th Cir. 1964) (footnote omitted); *see also United States v. 494.10 Acres of Land*, 592 F.2d 1130, 1132 (10th Cir. 1979) ("[I]f the 'future' is beyond or very much beyond the 'near future,' the use becomes speculative.").

Even if development of quarries at the Properties were legally and physically possible, we further conclude petitioners' arguments and evidence do not support a conclusion that the Properties' highest and best use are hypothetical quarries. We reject Mr. Wick's general and unsupported conclusion that there was an unmet local demand of 7.85 million tons per year in 2016. Mr. Wick calculated this market demand by estimating a per capita stone consumption of 5.23 tons per person multiplied by the percentage of population from his defined local markets.

Mr. Wick hand picked the counties that were included in the market analysis. Mr. Wick included Georgia counties within his local market which exceeded a 30-mile driving radius. In rebuttal Mr. Groff argued that the cost of transportation approaches the cost of the stone for those counties beyond 30 miles. In this Georgia market, material haulers generally bill transportation costs by the hour, and trucks are typically limited to 18.5 tons per load because of axle weight restrictions. The high cost of transportation is problematic as the increased cost of transporting the crushed stone would result in a negative cashflow making the mining at the Properties financially unfeasible. Mr. Wick's analysis estimated that the Properties could sell approximately one-fifth

---

[35] In sum, we determine that neither of the proposed quarries is financially feasible; therefore, development would not occur, notwithstanding authorized permitting and the physical possibility of mining at the Properties.

[*37] of the total annual projected sales to Fulton County. Fulton County is beyond a 30-mile driving radius from the Properties, and there are over 30 active mines within 30 driving miles of Fulton County. In sum, we find it unreasonable for Mr. Wick to include such distant markets in his analysis.

Furthermore, Mr. Wick used statistics that do not accurately represent a per capita stone consumption of 5.23 tons. Mr. Groff clarified that Mr. Wick used statewide data from the U.S. Geological Survey and the U.S. Census Bureau to calculate a local, county-level demand for crushed stone. Mr. Groff asserted:

> Developed high-density urban areas require fewer tons per capita than undeveloped, low-density rural areas. This does not imply that rural areas have a higher overall demand for stone – there are fewer people, thus resulting in less overall demand. A statewide tons per capita approach does not consider population density and local needs.

Mr. Wick further argued in his market analysis report that there is a local market in Meriwether County. We are unconvinced of such market demand in Meriwether County. Petitioners relied upon Mr. Cole, who testified that maintenance of the roads has always been an issue in Meriwether County, and in 2019 Meriwether County implemented a tax, TSPLOST, that would specifically go towards funding transportation improvements. Although Meriwether County began an initiative to fix the roads, it was not considered as of 2016 when the easement valuations were determined. Further, Mr. Gay testified that Meriwether County's population "is the same as it had [been] 100 years ago." Respondent's expert, Mr. Groff, provided U.S. Census Bureau data showing that, as of 2016, future population estimates for Meriwether County indicated a declining population or negative population growth.

Further, for the Green Rock Property Mr. Wick assumes that "[t]here are not any other granite operations being developed concurrently with the Green Rock Property in the general market area as of the valuation date," while for the Harman Road Property he additionally asserts that "[t]here are not any other granite operations being developed concurrently with the Harman Road Property in the general market area as of the valuation date." It defies logic how both statements by Mr. Wick can equally be correct.

**[\*38]** We find the more conservative rebuttal evidence offered by respondent's expert, Mr. Groff, to be convincing. Mr. Groff reasonably concluded that the Properties could foreseeably sell up to 300,000 tons of aggregate per year, which would result in a negative cashflow and would make aggregate mining at the Properties financially unfeasible.

We ultimately determine the record is insufficient to conclude that development of the Properties as granite quarries was both financially feasible and maximally productive. As is, there is simply "'too high a chance that the property will not achieve the proposed use in the near future,' in which case 'the use is too risky to qualify.'" *TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1369 (quoting *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 1000). The highest and best use of the Properties accordingly remains agricultural and rural reserve.

> D.      *FMV of the Properties*

> 1.      *Legal Framework*

Unsurprisingly, "[t]his Court has repeatedly affirmed that actual arm's-length sales occurring sufficiently close to the valuation date are the best evidence of value, and typically dispositive, over other valuation methods." *Buckelew Farm, LLC v. Commissioner*, T.C. Memo. 2024-52, at \*56, *aff'd*, No. 24-13268, 2025 WL 2502669 (11th Cir. Sept. 2, 2025); *see also Corning Place Ohio, LLC v. Commissioner*, T.C. Memo. 2024-72, at \*28, *aff'd*, 158 F.4th 715 (6th Cir. 2025); *Excelsior Aggregates, LLC v. Commissioner*, T.C. Memo. 2024-60, at \*31 ("The best evidence of a property's FMV is the price at which it changed hands in an arm's-length transaction reasonably close in time to the valuation date."); *ES NPA Holding, LLC v. Commissioner*, T.C. Memo. 2023-55, at \*14. For these purposes, both our Court and the U.S. Court of Appeals for the Eleventh Circuit have "f[ou]nd the purchase [of a partnership interest] reflective of the price that the market would pay for the Subject Property, especially when the ownership interest was nearly 100% and the only asset held by the Partnership was the Subject Property itself." *Buckelew Farm*, T.C. Memo. 2024-52, at \*56; *see also TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1368; *Oconee Landing Prop., LLC v. Commissioner*, T.C. Memo. 2024-25, at \*71–72, *supplemented by* T.C. Memo. 2024-73.

We often draw on one or more of three common approaches to determine the FMV of a piece of real property: (1) the market, or comparable sales, approach; (2) the income approach; and (3) a cost, or

[*39] asset-based, approach. *See, e.g.*, *Excelsior Aggregates*, T.C. Memo. 2024-60, at *32; *see also Bank One Corp. v. Commissioner*, 120 T.C. 174, 306 (2003), *aff'd in part, vacated in part, and remanded on another issue sub nom. JPMorgan Chase & Co. v. Commissioner*, 458 F.3d 564 (7th Cir. 2006). Our decision on which approach (or approaches) to use is a question of law, and the utility of the various approaches can depend on the type of property at issue. *See Chapman Glen Ltd. v. Commissioner*, 140 T.C. 294, 325–26 (2013); *see also Corning Place*, T.C. Memo. 2024-72, at *31; *Savannah Shoals, LLC v. Commissioner*, T.C. Memo. 2024-35, at *35.

The sales comparison approach looks at arm's-length transactions that involved properties similar to the subject properties and occurred within a reasonable time of the valuation date. *See, e.g.*, *Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C. 1, 19 (1979); *Butler v. Commissioner*, T.C. Memo. 2012-72, 2012 WL 913695, at *16. The income approach projects the future cashflows the property will generate at its highest and best use. *See, e.g.*, *Butler v. Commissioner*, 2012 WL 913695, at *17; *Trout Ranch, LLC v. Commissioner*, T.C. Memo. 2010-283, 2010 WL 5395108, at *8–10, *aff'd*, 493 F. App'x 944 (10th Cir. 2012). This method assumes that an investor would pay no more than the present value of the property's anticipated future income. *Butler*, T.C. Memo. 2012-72, 2012 WL 913695, at *17. The various approaches and the value indicated by previous sales provide a valuable sanity check for each other. *See Ranch Springs, LLC*, 164 T.C. at 134–35; *Excelsior Aggregates*, T.C. Memo. 2024-60, at *32.

2.      *"Before" FMV Analysis*

a.      *Actual Transactions Involving Green Rock Property and Harman Road Property*

The Court has affirmed that arm's-length sales occurring close to the valuation date are the best evidence of value. *See Seabrook Prop., LLC v. Commissioner*, T.C. Memo. 2025-6, at *73 (finding that the value of a company is relevant when determining the value of its real estate assets in a conservation easement context); *Buckelew Farm*, T.C. Memo. 2024-52, at *56; *ES NPA Holding, LLC*, T.C. Memo. 2023-55, at *14; *Estate of Newberger v. Commissioner*, T.C. Memo. 2015-246, at *6 (observing that no evidence is more probative of a donated property's FMV than its direct sale price).

**[*40]** The Seefrieds purchased the Green Rock Property in 2012 for approximately $2,325 an acre.[36] On December 16, 2016, Mr. Seefried sold approximately 89% of his interest in Green Rock to GR Investors for a total of $2,004,639.[37] Regarding the Harman Road Property, the Harman Road Short Year Return reported the cost basis of the Harman Road Property as $476,534—the value when Mr. Harman inherited it around 2003. On November 28, 2016, the Harmans sold their 97% interest in Harman Road for $1.5 million to CCP II Acquisitions. On the same day, November 28, 2016, CCP Acquisitions II sold its 97% interest in Harman Road to HR Investors for $3,406,044.[38]

"[T]he degree to which the purchase of an interest in a partnership whose sole asset is a piece of property reflects the fair market value of the property varies by situation." *See Lake Jordan Holdings, LLC v. Commissioner*, T.C. Memo. 2025-123, at *40 n.18. In these cases, the record is lacking as to whether (or not) the transactions were at arm's length. Similarly, neither party asserts that the Partnership transactions are indicative of value for either of the Properties. Thus we cannot determine whether these transactions were conducted at arm's length. *Cf. TOT Prop. Holdings, LLC*, 1 F.4th at 1368; *Lake Jordan Holdings*, T.C. Memo. 2025-123, at *51–52; *Seabrook Prop., LLC*, T.C. Memo. 2025-6, at *67–68; *Buckelew Farm*, T.C. Memo. 2024-52, at *56. Accordingly, we give no weight to these transactions.

### b. *Income Approach*

Petitioners argue that DCF analysis provides the best method to determine the FMV for the Green Rock Property and the Harman Road Property. The income approach determines FMV by discounting to present value the expected future cashflows from the property. *See, e.g., Butler v. Commissioner,* 2012 WL 913695, at *17; *Trout Ranch v. Commissioner*, 2010 WL 5395108, at *8–10.

Mr. Wick and Mr. Kenny both argued that the highest and best use of the Green Rock Property and the Harman Road Property was

---

[36] The original purchase of the Green Rock Property was part of a purchase of a larger parcel of land than what is at issue here. *See Oconee Landing Prop., LLC*, T.C. Memo. 2024-25, at *73.

[37] Mr. Seefried paid Paul $1,002,300 for the promotion of the conservation easement.

[38] Mr. Welton signed as both the buyer for HR Investors and the seller for CCP Acquisitions II.

[*41] aggregate mining. Mr. Wick conducted a DCF analysis for the Green Rock Property for a mine life of 23 years and for the Harman Road Property for a mine life of 18 years. On the basis of an operating plan and market analysis for a hypothetical mining business, he concluded that the FMV was approximately $19.6 million for the Green Rock Property and approximately $16.4 million for the Harman Road Property. Mr. Kenny assumed a 25-year mine schedule for the Green Rock Property and a 20-year mine schedule for the Harman Road Property. He concluded under a DCF analysis an FMV of the Green Rock Property of $17,054,827 and an FMV of the Harman Road Property of $14,541,043.

We reject for numerous reasons the DCF analysis methodology used by petitioners' experts. First, as mentioned above, we conclude the highest and best use of the Properties remains their continued use for agricultural, low density residential, and recreational purposes. Therefore, having rejected petitioners' premise that the highest and best uses of the Properties were as aggregate granite quarries, we similarly reject the use of the DCF analysis or the royalty method to value the Properties as presented by Mr. Wick and Mr. Kenny. *See Ranch Springs, LLC*, 164 T.C. at 151; *J L Mins., LLC v. Commissioner*, T.C. Memo. 2024-93, at *61 ("Our issues with the use of income approach in this context run deeper than just highest and best use, however, and would require rejection of [the income approach] even if we were to agree that kaolin mining was plausible.").

The prerequisite for determining FMV is that "a hypothetical willing buyer would purchase the subject property for the indicated value." *Ranch Springs, LLC*, 164 T.C. at 136 (quoting *Boltar, L.L.C. v. Commissioner*, 136 T.C. 326, 336 (2011)); *see Corning Place*, T.C. Memo. 2024-72, at *41; Treas. Reg. § 1.170A-1(c)(2). Mr. Krasinski's analysis of the Hayter Reports is particularly helpful in understanding the flaw in applying the DCF method to the Properties. Mr. Krasinski asserts that the Hayter Reports "assume[] a market participant will pay the same price for a property that has full legal permissibility . . . versus a property that requires a zoning change and all of the time that process entails." Further, he contends the Hayter Reports assume that the zoning changes and licenses will certainly be obtained without any consideration of risks. We agree with Mr. Krasinski's analysis as we likewise find it is not reasonable to assume that a buyer would pay the FMV of a hypothetical quarry merely to acquire raw land that is not adequately zoned for the operation of a granite quarry. *See Jackson Stone South, LLC v. Commissioner*, T.C. Memo. 2025-96, at *104–05;

**[\*42]** *Savannah Shoals*, T.C. Memo. 2024-35, at \*45 ("We are not convinced that a quarry operator would pay the [mineral's] net present value for the land as there would be no means for a profit.").

We further reject the use of the income approach for the hypothetical granite quarries since "[i]ncome valuation methods are not favored when valuing vacant land with no income-producing history because they are inherently speculative and unreliable." *Savannah Shoals*, T.C. Memo. 2024-35, at \*36. The speculative analysis is a problem as the appraiser is estimating the cost of creating a granite quarry from scratch and predicting future income and various costs over the life of the mine.[39] *See Ranch Springs, LLC*, 164 T.C. at 152. Here, the income approach is not appropriate to value the conservation easements considering the operation of granite quarries did not exist on the Properties. *See Excelsior Aggregates*, T.C. Memo. 2024-60, at \*44 ("Absent a financial track record, every input into the DCF analysis necessarily involves speculation."); *see also Corning Place*, T.C. Memo. 2024-72, at \*37 ("Lacking reliable data, the appraiser would have to rely on a lengthy series of assumptions, estimates, and guesstimates."). In *Beaverdam Creek Holdings, LLC v. Commissioner*, T.C. Memo. 2025-53, at \*42–43, the Court held that "the income method is not appropriate to value the easement property considering . . . no quarry business existed and all parties . . . were aware that there was never an intent for [the partnership] to operate a quarry." *See Excelsior Aggregates*, T.C. Memo. 2024-60, at \*44 ("That problem would be at its apogee here—attempting to predict the future revenues and expenses of a nonexistent business for a 30-year period.").

As mentioned above, we question Mr. Kenny's variables in his DCF analyses, including his reliance on Mr. Wick's market analysis. Mr. Groff opined that Mr. Wick's DCF analyses ignored known risks. These risks, which Mr. Groff considered to be virtual certainties, included the possibility of delayed permit approvals, problems encountered during mine development, unexpected market downturns, and competition from other new market participants. First, Mr. Wick makes an unfounded assumption of an estimated per capita stone consumption of 5.23 tons per person as he handpicks local markets beyond a 30-mile driving radius from the Properties—which would significantly increase

---

[39] "The income capitalization [approach] is most reliable when used to determine the value of an existing business with a track record of income, expenses, profits, and growth rates. A historical track record provides real-world inputs that supply a plausible basis for projecting future revenue." *Excelsior Aggregates*, T.C. Memo. 2024-60, at \*43.

[*43] the cost of transportation, resulting in a negative cashflow. He also includes Fulton County, which has over 30 active mines within 30 driving miles.

Second, Mr. Kenny assumes a materials harvest cost estimate of $8.75 per ton for the Green Rock Property. However, Green Rock executed a contract with Mr. Cowell near the valuation date which estimated that the Green Rock Property's cost for mining crushed stone, drilling, blasting, washing, and machinery was a minimum of $11.75. The change in mining cost would significantly reduce Mr. Kenny's DCF analysis. Petitioners argue that Mr. Kenny purposefully did not include the cost of washing the rock, and they assert that including this cost would not change the DCF since it would inversely increase the price per ton of aggregate sold. We are unconvinced, and it remains unclear why this cost was not accounted for by Mr. Kenny given that the executed contracts between Mr. Cowell and the Partnerships called for washing the aggregate.

Petitioners' DCF analysis uses inputs with many variables and unknowns; accordingly, we find their results to be unreliable. *See Corning Place*, T.C. Memo. 2024-72, at *37; *Lake Jordan Holdings*, T.C. Memo. 2025-123, at *48; *see also J L Mins.*, T.C. Memo. 2024-93, at *65 ("We caution taxpayers in the future who choose to use this method without strong support that we will view the income approach and the discounted cashflow method with skepticism, particularly in the conservation easement context.").

c.      *Sales Comparison Approach*

The sales comparison approach is commonly used to value property, and it determines FMV by considering the sale prices realized for similar properties sold in arm's-length transactions near the valuation date. *See Estate of Spruill v. Commissioner*, 88 T.C. 1197, 1229 n.24 (1987); *Wolfsen Land & Cattle Co.*, 72 T.C. at 19. Since no two properties are ever identical, the appraiser must make adjustments to account for the differences between the properties (e.g., building size and location) and the terms of the sales (e.g., proximity to valuation date and conditions of sale). The solidity of an appraiser's valuation "depends to a great extent upon the comparables selected and the reasonableness of the adjustments made." *Wolfsen Land & Cattle*, 72 T.C. at 19–20.

Mr. Eslava concluded that the highest and best use of the Properties is "to hold the property [Green Rock Property and Harman

[*44] Road Property] in its vacant status for continued use for timber, agricultural, low density residential and recreational purposes." Consistent with his highest and best use determination, Mr. Eslava identified five land sales for both the Green Rock Property and the Harman Road Property. The comparable properties were sites in Meriwether County near the Properties that were zoned for timber, recreational, agricultural, and low density residential. The Green Rock Property's comparable land sale prices ranged from approximately $1,762 per acre up to $3,386 per acre, and the dates of sales ranged from July 2016 to March 2017. The Harman Road Property's comparable sale prices ranged from approximately $2,420 per acre up to $3,718 per acre, and the dates of sales ranged from November 2015 to July 2017. To reach a valuation conclusion Mr. Eslava adjusted the Properties' comparison land sales on the basis of (1) marketing condition (time) adjustments for property value increases during the timeframe, (2) size adjustments, (3) location/access, and (4) improvements to the land. Ultimately, he arrived at a before conservation easement valuation for the Green Rock Property of $313,000 and for the Harman Road Property of $545,000.

We find that the five properties Mr. Eslava used in his sales comparison approach were comparable to the Green Rock Property and the Harman Road Property. All the comparable properties were in Meriwether County, near the Properties, and were zoned for timber, recreational, and agriculture—similar to the determined highest and best use of the Green Rock Property and the Harman Road Property.

Petitioners argue that Mr. Eslava chose comparables that are not truly comparable to the subject Properties as he selected sales that lacked information as to geological studies, drilling data, testing information, quantity of mineral reserves information, etc., all of which were known about the subject Properties. As previously discussed, we are not inclined to conclude that the highest and best use of the Green Rock Property and the Harman Road Property is for mining aggregate. We conclude that the highest and best use of the Properties before the conservation easement donations remained timber, agricultural, low density residential, and recreational use. Moreover, Mr. Eslava rebuts this argument by asserting that both parcels of land were within the Piedmont province, north of the Piedmont Fall Line—a province that is known to contain weathering-resistant granite bedrock and economically mineable granite mines. Thus, additional drilling and testing would not likely have affected the sale prices of his five comparable properties given that the location of the parcel was in the

[*45] Piedmont province and that the highest and best use was not for mining aggregate.

Petitioners presented evidence from Mr. Kenny, who also used the sales comparison approach to value the Properties; however, his seven comparable properties for both the Green Rock Property and the Harman Road Property consist solely of properties that were either operating presently as quarries or were greenfields that were purchased for quarry development or expansion.

After adjustments Mr. Kenny provided a value range, correlated and rounded, for the Green Rock Property of $11.6 million to $21.34 million, and a value range, correlated and rounded, for the Harman Road Property of $9.62 million to $24.08 million. However, none of his selected properties appears to be comparable. Mr. Kenny cherry-picked sales of properties that were either permitted for mining or were reasonably likely to receive a mining permit. Further, the chosen sale properties were not near the subject Properties, were scattered throughout Georgia or Tennessee, or were operating quarries or were purchased to expand a quarry. Furthermore, five out of the seven properties were either purchased by, owned by, or connected to Vulcan Materials Co. His overall conclusions were also predicated on the assumption that the Properties would obtain the proper zoning for the operation of an aggregate granite quarry. In sum, we reject Mr. Kenny's conclusion of FMV as we find it is not well supported.

As previously discussed, we are not inclined to conclude that the highest and best use of the Green Rock Property and the Harman Road Property is for mining aggregate. We conclude that the highest and best use of the Properties before the conservation easement donations remained timber, agricultural, low density residential, and recreational use. Petitioners have not presented evidence, such as comparable sales, in support of an FMV with timber, agricultural, low density residential, and recreational use for the Properties.

After considering all of the evidence presented, we conclude that the most appropriate before easement FMVs for the Properties are Mr. Eslava's valuations: $313,000 for the Green Rock Property and $545,000 for the Harman Road Property.

3.    *"After" FMV Analysis*

Petitioners presented evidence from Mr. Kenny, who used the sales comparison approach to value both of the Properties after the

**[\*46]** conservation easements were in place.[40] Respondent's expert Mr. Eslava also uses the sales comparison approach for the Green Rock Property and the Harman Road Property by analyzing sales of comparable properties located in central and northern Georgia ranging in parcel size from 111.71 acres to 368.69 acres.

After considering all of the evidence presented, we find respondent's analysis to be well supported. Respondent's comparable properties were in central and northern Georgia near the Properties, with one in Meriwether County. Three out of the six comparable properties used by petitioners' expert Mr. Kenny were in Alabama, and he failed to provide any land sales in Meriwether County. We determine Mr. Eslava's comparable sales analysis provides the most appropriate after easement FMV for the Properties; therefore, the after easement FMVs for the Green Rock Property and the Harman Road Property are $232,000 and $400,000, respectively.

As stated above, the FMV of a conservation easement is equal to the difference between the FMV of the property it encumbers "before" the granting of the restriction and the FMV of the encumbered property "after" the granting of the restriction. *See* Treas. Reg. § 1.170A-14(h)(3)(i). We hold the amount of Green Rock's allowable charitable contribution deduction under section 170 to be $81,000, which is the difference between the "before" value of $313,000 and the "after" value of $232,000. We further hold the amount of Harman Road's allowable charitable contribution deduction under section 170 to be $145,000, which is the difference between the "before" value of $545,000 and the "after" value of $400,000.

IV.  *Penalties*

Respondent determined 40% penalties under section 6662(e) and (h) for gross valuation misstatements.

The Code imposes a penalty for "the portion of any underpayment [of tax] which is attributable to . . . [a]ny substantial valuation misstatement." I.R.C. § 6662(a), (b)(3). A misstatement is "substantial" if the value of the property claimed on a return is 150% or more of the

---

[40] Mr. Kenny divided his analyses between the portions of the Properties that were encumbered with a conservation easement, 125.15 acres for the Green Rock Property and 181.61 acres for the Harman Road Property, and the portions that were excluded, 15 acres for the Green Rock Property and 10 acres for the Harman Road Property.

**[\*47]** correct amount. I.R.C. § 6662(e)(1)(A). The penalty is increased to 40% in the case of a "gross valuation misstatement." I.R.C. § 6662(h). A misstatement is "gross" if the value of property claimed on the return exceeds 200% of the correct amount. I.R.C. § 6662(h)(2)(A)(i).

Since the claimed deduction of $13,570,000 for the Green Rock Property donation exceeds 200% ($81,000 × 200% = $162,000) of the amount determined to be the correct amount of the valuation, we find that the valuation for the Green Rock Property is a gross misstatement. We find the Harman Road Property valuation is also a gross misstatement as the claimed deduction of $18.3 million exceeds 200% ($145,000 × 200% = $290,000) of the amount determined to be the correct amount of the valuation. These findings trigger application of 40% gross valuation misstatement penalties under section 6662(e)(1)(A) and (h) to those portions of the underpayments attributable to values claimed that exceed the values determined here.

Generally, an accuracy-related penalty is not imposed if the taxpayer demonstrates "reasonable cause" and shows that he "acted in good faith with respect to [the underpayment]." I.R.C. § 6664(c)(1). This defense may be available where a taxpayer makes a "substantial" valuation overstatement with respect to charitable contribution property. *See* I.R.C. § 6664(c)(3) (second sentence). But this defense is not available where the overstatement is "gross." *See* I.R.C. § 6664(c)(3) (first sentence). Consequently, we will sustain the 40% gross valuation misstatement penalties respondent imposed, and we do not need to address any potential reasonable cause defense since none could apply to this penalty. *See* I.R.C. § 6664(c)(3); *Chandler v. Commissioner*, 142 T.C. 279, 293 (2014).

Respondent also seeks a 20% penalty for an underpayment due to negligence or a substantial understatement of income tax. *See* I.R.C. § 6662(a) and (b)(1) and (2). This penalty would apply to what might be called any "lower tranche" of the underpayment, i.e., the portion of any underpayment that was not attributable to a valuation misstatement. *See Plateau Holdings, LLC v. Commissioner*, T.C. Memo. 2021-133, at \*2. Because we hold that Green Rock and Harman Road are entitled to deductions for the correct value of the conservation easement, there is no underpayment not attributable to a valuation misstatement, and we need not address the alternative penalties.

**[\*48]** V.    *Conclusions*

For tax year 2016 we hold Green Rock is entitled to a charitable contribution deduction under section 170 of $81,000 for its donation of a conservation easement of 125.15 acres to Oconee River Land Trust. We further hold for tax year 2016 Harman Road is entitled to a charitable contribution deduction under section 170 of $145,000 for its donation of a conservation easement of 181.61 acres to Oconee River Land Trust.

With respect to penalties, we hold that the Partnerships are each liable for 40% gross valuation misstatement penalties under section 6662(h)(1) and (2)(A)(i) for those portions of the underpayments attributable to values claimed which are greater than the determined values.

We have considered all of the arguments that the parties have made, and to the extent they are not addressed herein, we find the arguments to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*